**WILLIAMS, APPELLEE, *v*. ORMSBY, APPELLANT.**

**[Cite as *Williams v. Ormsby,* 131 Ohio St.3d 427, 2012-Ohio-690.]**

*Contracts—Consideration—Merely moving into a home with another while engaging in a romantic relationship is not consideration for the formation of a contract—Judgment reversed.*

(No. 2010-1946—Submitted September 20, 2011—Decided February 23, 2012.)

APPEAL from the Court of Appeals for Medina County, No. 09CA0085-M,

190 Ohio App.3d 815, 2010-Ohio-4664.

_____

SYLLABUS OF THE COURT

Merely moving into a home with another while engaging in a romantic relationship is not consideration for the formation of a contract.

_____

**LANZINGER, J.**

{¶ 1} We are asked to determine whether merely resuming a romantic relationship by moving into a home with another can serve as consideration for a contract. We hold that it cannot.

I. Factual Background

{¶ 2} This case arises in the context of a nonmarital relationship between Amber Williams, the appellee, and Frederick Ormsby, the appellant. In May 2004, Frederick moved into Amber's house on Hardwood Hollow in Medina to which she had received title through her divorce settlement. Frederick began making the mortgage payments in August and paid the 2004 property taxes. He eventually paid the remaining mortgage balance of approximately $310,000. In return, Amber gave Frederick title to the property by executing a quitclaim deed dated December 15, 2004, that was recorded the same day.

{¶ 3} Although the couple had planned to marry, they canceled their plans in January 2005 when Frederick's divorce did not occur. They did, however, continue to live together. After a disagreement in March 2005, Amber left the house, and Frederick obtained a restraining order against her. As a result of this separation, Amber and Frederick signed a document dated March 24, 2005, to immediately sell the Medina house and allocate the proceeds.

{¶ 4} Two months later, the couple tried to reconcile and attended couples counseling. Amber refused to move back into the house with Frederick unless he granted her an undivided one-half interest in the property. On June 2, 2005, they signed a second document, purportedly making themselves "equal partners" in the Medina house and, among other things, providing for property disposition in the event that their relationship ended. Amber then returned to the house, and the couple resumed their relationship. But by April 2007, they were living in separate areas of the house, and although they tried counseling again, Amber ended the relationship in September 2007. The two continued living in separate areas of the house until Frederick left in April 2008.

{¶ 5} The next month, Amber and Frederick filed suit against each other in two separate actions, which the trial court consolidated. Amber sought either specific performance of the contract that she alleged was created in June 2005 to give her a half-interest in the property or damages stemming from breach of that contract. In his complaint, Frederick alleged causes of action to quiet title and for unjust enrichment or quantum meruit and sought a declaratory judgment that both the March 2005 and June 2005 documents are invalid for lack of consideration. He also alleged causes of action for breach of contract, partition, and contribution if either or both agreements were held valid.

{¶ 6} Both parties filed motions for summary judgment. On April 16, 2009, the trial court determined that the March 2005 agreement was supported by consideration but that the June 2005 agreement was not. The court granted

judgment to Frederick on Amber's complaint and held that title to the property was vested in him exclusively. Amber was granted judgment on Frederick's causes of action for contribution and unjust enrichment. The trial court ruled that the only issue remaining for trial was whether Frederick was entitled to damages for any possible breach of the March 2005 contract.

{¶ 7} Over the next several months, the parties amended their pleadings and attempted to dismiss various claims. A judgment entry was issued in October 2009 pursuant to Civ.R. 54(B) to declare that the court's summary judgment order was final and appealable and that there was no just reason for delay. Amber appealed.

{¶ 8} The Ninth District Court of Appeals reversed the trial court's judgment, concluding that under the facts of this case, "moving into a home with another and resuming a relationship can constitute consideration sufficient to support a contract." *Williams v. Ormsby*, 190 Ohio App.3d 815, 2010-Ohio-4664, 944 N.E.2d 699, ¶ 19 (9th Dist.). The court of appeals also held that the June 2005 contract was not conditioned upon marriage, and thus, the consideration had not failed. *Id.* at ¶ 22.

{¶ 9} Frederick appealed, and we accepted jurisdiction on his sole proposition of law: "Moving into a home with another and resuming a romantic relationship cannot serve as legal consideration for a contract; love and affection is [sic] insufficient consideration for a contract."[1]

---

1. Although referred to in the dissent, Amber's allegation that the deed may not have been properly executed is not before us.

## II. Legal Analysis

{¶ 10} We must first note that the proposition accepted does not refer broadly to all circumstances of cohabitation. As we have held, "[t]he essential elements of 'cohabitation' are (1) sharing of familial or financial responsibilities and (2) consortium." *State v. Williams*, 79 Ohio St.3d 459, 683 N.E.2d 1126 (1997), paragraph two of the syllabus. In the case before us, the issue is only whether the emotional aspect of resuming a relationship by moving in together can serve as consideration for a contract—separate and apart from the sharing of financial resources and obligations.

{¶ 11} Although the dissenting opinion takes a rather cynical view of the relationship between the parties and seems to liken it to a business transaction allowing Amber to avoid her creditors, we disagree. Speculation and innuendo are not evidence. While it is not surprising that there was no longer any love or affection between the parties at the time of their depositions, both Amber and Frederick agreed that they began a romantic relationship on April 30, 2004, moved in together the next month, became engaged in July 2004, separated in March 2005, and in June 2005, reunited and "plan[ned] to be married." Furthermore, although there was some evidence that Amber had some outstanding financial obligations from her divorce at the time Frederick moved into the house, there is absolutely no evidence that she was unable or unwilling to meet those obligations.

{¶ 12} Frederick contends that the only consideration offered for the June 2005 agreement was resuming a romantic relationship, which cannot serve as consideration for a contract. He argues that to enforce such a contract is the same as enforcing a contract to make a gift in consideration of love and affection.

{¶ 13} Amber counters that the March 2005 agreement was novated, i.e., legally replaced, by the June 2005 agreement and that Frederick received a benefit

4

that he bargained for. She maintains that the June 2005 agreement was supported by consideration.

*A. General Contract Principles*

**{¶ 14}** We have stated, " 'A contract is generally defined as a promise, or a set of promises, actionable upon breach. Essential elements of a contract include an offer, acceptance, contractual capacity, consideration (the bargained for legal benefit and/or detriment), a manifestation of mutual assent and legality of object and of consideration.' " *Kostelnik v. Helper*, 96 Ohio St.3d 1, 2002-Ohio-2985, 770 N.E.2d 58, ¶ 16, quoting *Perlmuter Printing Co. v. Strome, Inc.*, 436 F.Supp. 409, 414 (N.D.Ohio 1976).

**1. The need for consideration**

**{¶ 15}** In this case, we are concerned with the legal enforceability of the June 2005 writing,[2] for a contract is not binding unless supported by consideration. *Judy v. Louderman*, 48 Ohio St. 562, 29 N.E. 181 (1891), paragraph two of the syllabus.

**{¶ 16}** Consideration may consist of either a detriment to the promisee or a benefit to the promisor. *Irwin v. Lombard Univ.*, 56 Ohio St. 9, 19, 46 N.E. 63 (1897). A benefit may consist of some right, interest, or profit accruing to the promisor, while a detriment may consist of some forbearance, loss, or responsibility given, suffered, or undertaken by the promisee. *Id.* at 20.

**{¶ 17}** We also have a long-established precedent that courts may not inquire into the adequacy of consideration, which is left to the parties as " 'the sole judges of the benefits or advantages to be derived from their contracts.' " *Hotels Statler Co., Inc. v. Safier*, 103 Ohio St. 638, 644-645, 134 N.E. 460 (1921),

---

2. Although the trial court had the issue of the enforceability of both the March and June agreements before it, Frederick did not appeal the trial court's decision that the March agreement was supported by consideration. He now acknowledges that the March agreement was a valid contract, supported by mutual consideration.

quoting *Newhall v. Paige*, 10 Gray (76 Mass.) 366, 368 (1858). But whether there is consideration at all is a proper question for a court.

> Gratuitous promises are not enforceable as contracts, because there is no consideration. * * * A written gratuitous promise, even if it evidences an intent by the promisor to be bound, is not a contract. * * * Likewise, conditional gratuitous promises, which require the promisee to do something before the promised act or omission will take place, are not enforceable as contracts. * * * While it is true, therefore, that courts generally do not inquire into the adequacy of consideration once it is found to exist, it must be determined in a contract case whether any "consideration" was really bargained for. If it was not bargained for, it could not support a contract.

*Carlisle v. T & R Excavating, Inc.*, 123 Ohio App.3d 277, 283-284, 704 N.E.2d 39 (9th Dist.1997).

### 2. Novation

{¶ 18} Amber argues that the June 2005 agreement is a valid novation of the March 2005 agreement. "A contract of novation is created where a previous valid obligation is extinguished by a new valid contract, accomplished by substitution of parties or of the undertaking, with the consent of all the parties, and based on valid consideration." *McGlothin v. Huffman*, 94 Ohio App.3d 240, 244, 640 N.E.2d 598 (12th Dist.1994). A novation can never be presumed but must be evinced by a clear and definite intent on the part of all the parties to the original contract to completely negate the original contract and enter into the second. *King Thompson, Holzer-Wollam, Inc. v. Anderson*, 10th Dist. No. 93APE08-1155, 1994 WL 14791, * 2 (Jan. 20, 1994).

{¶ 19} Because a novation is a new contract, it too must meet all the elements of a contract. Therefore, even if the June 2005 document is a novation of the original March 2005 agreement, it must be supported by consideration.

**3. Distinction between contract and gift**

{¶ 20} The trial court concluded that the June 2005 agreement was nothing more than a written gratuitous promise because there was no consideration for that agreement. In fact, the requirement for consideration is what distinguishes a contract from a gift. The essential elements of an inter vivos gift are (1) an intention on the part of the donor to transfer the title and right of possession to the donee, (2) delivery by the donor to the donee, (3) relinquishment of ownership, dominion, and control over the gift by the donor, and (4) acceptance by the donee. *Bolles v. Toledo Trust Co.*, 132 Ohio St. 21, 26-27, 4 N.E.2d 917 (1936). Therefore, a gift is a voluntary transfer by the donor to the donee without any consideration or compensation.

{¶ 21} Even if we were to construe the June 2005 agreement as a promise to make a gift of one-half interest in the property, we must still examine whether there is consideration, because even a written promise to make a gift is not binding on the promisor if the promise lacks consideration. *Hendrie v. Hendrie*, 94 F.2d 534, 535 (5th Cir.1938).

*B. The Agreements*

{¶ 22} To be enforceable between the parties, therefore, the agreements must be supported by consideration. Although the enforceability of the March agreement is not before us, the terms of both documents signed by the parties will be summarized.

**1. The March 2005 agreement**

{¶ 23} The trial court found that in March 2005, the parties executed a valid, written contract supported by mutual consideration. This agreement provided that the Hardwood Hollow house would be sold, with the first $324,000

of the proceeds to Frederick and the balance to Amber. Both Frederick and Amber specified their separate rights to reside at the property until it was sold.[3] Under the March 2005 agreement, Amber assumed responsibility for the real estate taxes if the property was not sold in two months. The two also were to equally share the costs necessary to operate and maintain the house as long as both were living there. This agreement also detailed who was responsible for certain bills and repairs to the residence.

{¶ 24} The March 2005 agreement also provided an alternative plan whereby Frederick could pay Amber the difference between $324,000 and the fair market value of the property, and Amber would then vacate the residence.

### 2. The June 2005 agreement

{¶ 25} With respect to the second document, signed in June 2005, the trial court found that the writing was not a valid contract, because there was no consideration to support it. The June document, which asserted the March contract to be void, stated that "for valuable consideration," the parties agreed that although titled solely in Frederick's name, the house was owned jointly by Frederick and Amber and that they were equal partners. In addition, Amber's name would be placed on the deed at a time she specified, and she could file a lien against the house for her share of the property until it was retitled. This writing required Frederick to pay all expenses on the property, including taxes and insurance. If the house was sold, Amber and Frederick would divide the proceeds from the sale after expenses were paid. Finally, if their relationship ended and they chose not to sell the house, Frederick could elect to keep the house and pay Amber for her share of the property or to leave the house to Amber after being paid for his share.

---

3. The parties also agreed to request that the pending charge of domestic violence against Amber be withdrawn.

*C. The Court of Appeals' Opinion*

{¶ 26} Although the court of appeals relied on the idea that a relationship could provide contract consideration, it did not define the term "relationship." Nor did it provide any Ohio law that has established this proposition. Rather, it distinguished an earlier case of the Ninth District Court of Appeals, *Carlisle*, 123 Ohio App.3d 277, 704 N.E.2d 39, and cited a case involving a contract to make a will, *Snyder v. Warde*, 151 Ohio St. 426, 86 N.E.2d 489 (1949), and two out-of-state cases, *Tiggelbeck v. Russell*, 187 Ore. 554, 213 P.2d 156 (1949), and *In re Estate of Roccamonte*, 174 N.J. 381, 808 A.2d 838 (2002).

**1. The *Carlisle* case**

{¶ 27} With respect to its own case, the appellate court attempted to distinguish the facts. A company owned solely by Thomas Carlisle, T & R Excavating, Inc., had agreed to provide free labor in constructing a preschool for Janis Carlisle, Thomas's wife at the time, and two companies that she owned. *Carlisle* at 281-282. Construction was abandoned halfway through the project. Another company completed the project, although a week late. Janis sued her husband's company. In reversing the trial court's judgment that there was an enforceable contract, the Ninth District Court of Appeals held that "the relationship between Mr. Carlisle and Ms. Carlisle could not have been consideration for a contract." *Id.* at 284, citing Restatement of the Law 2d, Contracts, Section 71, Comment a (1981) ("in consideration of love and affection" is legally insufficient consideration), and 2 Corbin, Contracts, 90, Section 5.18 (Rev.1995).

{¶ 28} Although the Ninth District Court of Appeals now suggests that *Carlisle* differs from the case before us, because *Carlisle* involved three separate, informal documents between a married couple, *Carlile*'s discussion of the requirement of consideration to support a contract did not rely only on the fact that the parties were married at the time. That court held, "A desire to help cannot

be consideration for a contract; rather, it is merely a motive." *Carlisle* at 284. It concluded that Thomas Carlisle had merely promised a gift to his wife. *Id*. at 287.

{¶ 29} Furthermore, the cases on which the court of appeals did rely are not persuasive with respect to the circumstances before us.

### 2. The *Snyder* case

{¶ 30} The court of appeals stated that Ohio law has considered "personal relationships" in the context of a contract and cites *Snyder*, 151 Ohio St. 426, 86 N.E.2d 489. *Williams*, 190 Ohio App.3d 815, 2010-Ohio-4664, 944 N.E.2d 699, at ¶ 19. In *Snyder*, a housekeeper had sought to enforce an oral agreement to make a will against the estate of her deceased former employer. *Snyder* at 427. Although Ohio law required that agreements to make a will must be in writing, the housekeeper argued that because the services she had performed were usually not compensable in money, her agreement was not covered by the statute of frauds. *Id.* at 434-435. *Snyder* held that the lengthy list of the diverse services the housekeeper had performed (cooking, cleaning, canning, laundry, secretarial work, business errands, serving as his driver, caring for him when he was ill) were services ordinarily compensable in money. *Id.* at 436-437. In fact, the housekeeper had been paid $40 per month, along with room and board for herself and her children. *Id.* at 438.

{¶ 31} When this court reviewed the discretionary appeal, we stated that there may be times when a contract may be enforced when the consideration for the contract " 'had been paid in personal services, not intended to be, and not susceptible of being, measured by a pecuniary standard.' " *Id.* at 435, quoting *Shahan v. Swan*, 48 Ohio St. 25, 40, 26 N.E. 222 (1891). We further elaborated, "In order for services to be such as are not compensable in money they must be of a kind which are rendered as a result of a sacrifice by the one performing them, generally being rendered because of love and affection." *Id.* at 438. Ultimately,

this court concluded that the contract to make a will was not enforceable because the services performed were the type compensable in money.

{¶ 32} The court of appeals relied on our language from *Snyder* regarding services performed out of love and affection to find that Amber's decision to move back in the house and resume her relationship with Frederick was valid contract consideration because "romantic relationships typically involve some sacrifice by each partner." *Williams*, 190 Ohio App.3d 815, 2010-Ohio-4664, 944 N.E.2d 699, at ¶ 19.

{¶ 33} Such reliance is misplaced, however, for although we noted several cases from different states in which contracts were held to be enforceable due to personal services rendered by one party in exchange for a promise to make a will, we also stated that "in almost every instance the person who had performed the personal services had done so *at a considerable sacrifice of his own interests.*" (Emphasis added.) *Snyder*, 151 Ohio St. at 438, 86 N.E.2d 489. Furthermore, in those cases, the personal services, rather than the relationship or the love and affection, served as consideration for the contract. In essence, those courts enforced the contracts to make a will based on a theory of promissory or equitable estoppel due to the promisees' detrimental reliance on the promise. Here, there is no evidence that moving back into the house or resuming a romantic relationship involved a considerable sacrifice of Amber's interests. And Amber did not argue promissory or equitable estoppel.

{¶ 34} Nothing in *Snyder* states that a relationship, romantic or otherwise, may serve as consideration for a contract. Instead, *Snyder* stands for the proposition that providing ordinary services typically compensable in money will not allow an oral contract to avoid the statute of frauds. *Id.* at 434.

### 3. The *Tiggelbeck* case

{¶ 35} The court of appeals used *Tiggelbeck*, 187 Ore. 554, 213 P.2d 156, an Oregon decision, as support for its contention that companionship has been

11

recognized in case law as valid consideration. But the appellate court oversimplified the holding of that case. *Williams*, 190 Ohio App.3d 815, 2010-Ohio-4664, 944 N.E.2d 699, ¶ 19. *Tiggelbeck* involved enforcement of an agreement to make reciprocal wills, which were written but did not meet Oregon's legal requirements. The issue was whether the plaintiff had sufficiently performed her obligations under the alleged oral agreement so that the statute-of-frauds requirement of a writing could be avoided. *Tiggelbeck* at 563-565.

{¶ 36} In 1924, Marie Tiggelbeck, a young school teacher, began living as a "roomer and boarder" in the home of Imogen Russell's parents, where Imogen also lived. *Id.* at 560. Over the years, Marie and Imogen developed a close friendship and orally agreed that Marie would decline lucrative factory work in another area to stay at the Russell home, help with cooking and housekeeping, and pay a reduced rent. *Id.* at 561-562. The two agreed to share living expenses and leave the other all her property on death. *Id.* at 562.

{¶ 37} Unfortunately, the written wills they attempted did not have the requisite formalities. After Imogen's death in 1947, Marie filed suit for specific enforcement of an oral contract to devise and bequeath property. The court was asked whether the alleged oral agreement was sufficiently established to satisfy the statute of frauds. Because there was evidence corroborating the existence of the oral agreement, and because Marie had performed all her obligations under the contract, which involved both ordinary and extraordinary services, including, but not limited to, companionship, the Oregon court held that Marie was entitled to equitable relief and that the oral agreement to make a will was enforceable against Imogen's estate. *Id.* at 590. The court stated:

> In order to fulfill her part of the agreement, Marie changed the course of her life and circumstances, restricted, for so uncertain a period as the duration of the life of the other party, her freedom of

movement and of enterprise, and entered into a family or quasi family relationship in which she performed services of an extraordinary character not capable of measurement by any pecuniary standard.

*Id.*

### 4. The *Roccamonte* case

**{¶ 38}** The final case that the court of appeals considered persuasive was from New Jersey, a state that recognizes a contract of palimony between cohabitating individuals and holds that entering into a relationship and conducting oneself as if married is sufficient consideration to enforce an oral promise for life-long support, even after the promisor's death. *Roccamonte*, 174 N.J. 381, 395-396, 808 A.2d 838. But palimony is not recognized by Ohio statute or common law, and Ohio does not permit a division of assets or property based on cohabitation. See *Lauper v. Harold*, 23 Ohio App.3d 168, 170, 492 N.E.2d 472 (1985).

**{¶ 39}** Our state has steadily retreated from recognizing property interests in romantic relationships. For instance, amatory causes of action were abolished in 1978 through R.C. 2305.29, *see also Strock v. Pressnell*, 38 Ohio St.3d 207, 527 N.E.2d 1235 (1988), and common-law marriages were prohibited in Ohio by statutory amendment after October 10, 1991, R.C. 3105.12(B)(1).

### D. *Love and Affection Are Not Consideration for a Contract*

**{¶ 40}** Having rejected the cases that the court of appeals relied upon, we conclude that our decision in *Flanders v. Blandy*, 45 Ohio St. 108, 12 N.E. 321 (1887), is instructive on whether moving into the home with another while engaging in a romantic relationship is consideration for the formation of a contract. In *Flanders*, a father had intended to give his daughter certain bonds worth $2,000 in addition to interest. But the daughter did not receive the bonds as

a gift, because they were never delivered to her. Her father then delivered to her a written promise to pay her $2,000 with interest in lieu of the bonds. Upon her father's death, the daughter sought to enforce the written promise, but we held that her father's promise to give her the value of the bonds was not enforceable as a contract, because that promise lacked consideration. *Id.* at 113.

**{¶ 41}** We stated that a gift required a transfer to take effect "for the reason that, there being no consideration therefor, no action will lie to enforce it." *Id.* And we continued to explain why the father's written promise would not be enforced: "An agreement to give *for the consideration of love and affection, whether the gift is to be of goods and chattels or of a chose in action, neither transfers the property* to the donee, *nor secures him a right by suit to compel a completion of the contract.*" (Emphasis added.) *Id.* at 114. Thus, for more than a century, love and affection alone have not been recognized as consideration for a contract.

*E. The June 2005 Document—A Failed Contract and Novation*

**{¶ 42}** The court of appeals used both *Snyder* and *Roccamonte* to conclude that consideration supported the June 2005 document: "As in *Roccamonte,* by resuming the relationship, [Amber] agreed to undertake a way of life that entailed among other things 'providing companionship, and fulfilling each other's needs, financial, emotional, physical, and social, as best as [she was] able,' as well as foregoing other romantic possibilities." *Williams*, 190 Ohio App.3d 815, 2010-Ohio-4664, 944 N.E.2d 699, at ¶ 20, quoting *Roccamonte*, 174 N.J. at 392, 808 A.2d 838. Nevertheless, the record does not show evidence of this statement. The June 2005 document states that Amber has "inhabited" the house since 1997. It states that she and Frederick plan to be married and reside there. Apart from stating that Frederick will pay all the expenses for the property, the document makes no mention of fulfilling each other's needs—financial, emotional, physical, social, or otherwise.

{¶ 43} Although the June document states that the agreement was made "for valuable consideration," it does not specify what the consideration is. The document does not refer to "fulfilling each other's needs, financial, emotional, physical, and social." The court of appeals supplied those terms on its own. And unlike the March 2005 agreement, which contains mutual obligations and benefits (i.e., both parties had a right to reside at the property and equally shared costs necessary to maintain the house, with Amber being responsible for real estate taxes starting the second half of 2004), the June 2005 document requires Frederick to pay all expenses, taxes, and insurance costs. Nonetheless, the court of appeals relied on Amber's reply to a question whether she had paid Frederick or given him anything of value in exchange for the June 2005 agreement. She stated, "I didn't pay him anything, no. I thought what was of value was the fact that we were sharing all sorts of things. He had my love. He had—I shared my assets with him, too. We were living together as a couple." But this vague statement falls short of establishing that she shared her assets as consideration for the June 2005 agreement and appears to refer to how she had previously shared her assets before entering into the June agreement.

{¶ 44} Rather, the evidence demonstrates that the only consideration offered by Amber for the June 2005 agreement was her resumption of a romantic relationship with Frederick. There is no detriment to Amber in the June 2005 document, only benefit. Essentially, this agreement amounts to a gratuitous promise by Frederick to give Amber an interest in property based solely on the consideration of her love and affection. Therefore, the June 2005 document is not an enforceable contract, because it fails for want of consideration.

{¶ 45} Amber argues, and the dissent agrees, that the voiding of the March agreement in the June document was consideration for the June agreement, and thus Amber contends that the June agreement amounted to a novation. The substitution of one of the original parties to a contract by a third party who

assumes the responsibilities and benefits of that original party is a novation. *See Bacon v. Daniels*, 37 Ohio St. 279 (1881), paragraph two of the syllabus ("An agreement between the parties to a contract and a third person, whereby one party is released from the obligations of the contract, and the third person substituted in his stead, is a *novation*, and requires no further consideration than such release and substitution"). In this case, there is no substitution of party but rather an attempt to change the obligations of the parties under an existing contract. But a novation is effective only when a previous valid obligation is extinguished by a *new valid contract*. In order to qualify as a novation, the June agreement must be a valid contract in its own right *before* it can be used to void the March agreement.

{¶ 46} Amber had been living in the house for more than seven years, having lived there with her husband and having retained the residence as part of the property division in their divorce. Despite having transferred legal ownership to Frederick in December 2004, Amber already had the contractual right to reside in the property by virtue of the March 2005 contract, which had required her to vacate the guest bedroom and bath to accommodate Frederick. She was also to have been granted upon the sale of the residence the net proceeds of the sale after Frederick received $324,000. It was Amber's demand that she be given an equal property interest in the house before she would move back in and resume her romantic relationship with Frederick—there was no consideration.

{¶ 47} Because there is no consideration for the June agreement, it cannot extinguish the existing obligations established under the March agreement. Therefore, the June document was not an enforceable novation of the March 2005 agreement.

{¶ 48} We hold that merely moving into a home with another while engaging in a romantic relationship is not consideration for the formation of a

contract. To hold otherwise would open the door to palimony claims and invite a number of evidentiary problems.

### III. Conclusion

{¶ 49} We will not contractually bind parties to promises based merely on their resumption of a romantic relationship in residing together. We therefore reverse the judgment of the Ninth District Court of Appeals.

Judgment reversed.

O'CONNOR, C.J., and LUNDBERG STRATTON, CUPP, and MCGEE BROWN, JJ., concur.

O'DONNELL, J., concurs in judgment only.

PFEIFER, J., concurs in part and dissents in part.

_____

**PFEIFER, J., concurring in part and dissenting in part.**

{¶ 50} One can hardly disavow the syllabus law in the majority opinion. It is good law, and it should be, though it is irrelevant to this case. I dissent from the balance of the majority opinion aside from its recitation of the facts, upon which I will rely.

{¶ 51} The majority seems to have chased a red herring ("love and affection") all the way upstream until it reached a dry creek bed. Love and affection were not offered in consideration of the June 2005 contract. Although the contract refers to a contemplated marriage, it never mentions love and affection.

{¶ 52} The record is replete with shadings and innuendo that there was no love and affection between the parties. The record includes statements that suggest or allege that Williams and Ormsby were searching for a way to continue living well without engaging in full-time work, that Williams was seeking to both delude and elude creditors, that Williams's name may have been fraudulently signed on the quitclaim deed or that the person who notarized her signature did so

without being present when Williams signed, that domestic-violence charges had been filed, and that each had promised not to accuse the other of domestic violence. That Williams wouldn't move back into the house until Ormsby signed the agreement, which he wrote, was not offered as consideration and was not consideration. It was a simple fact of life—a fact that is outside the contract and is of no relevance.

{¶ 53} The resolution of this case should be straightforward. Among the consideration that Williams and Ormsby offered for the second agreement was the voiding of the first agreement, which denied to each of them rights that the first agreement granted. That either or both of them offered additional consideration is beside the point because we consider only the existence of consideration, not its adequacy. *Judy v. Louderman,* 48 Ohio St. 562, 29 N.E. 181 (1891), paragraph two of the syllabus ("While it is necessary that the consideration of a promise should be of some value, it is sufficient if it be such as *could* be valuable to the party promising; and the law will not enter into an inquiry as to the adequacy of the consideration, but will leave the parties to be the sole judges of the benefits to be derived from their contracts, unless the inadequacy of consideration is so gross as of itself to prove fraud or imposition." [Emphasis added]); *Rogers v. Runfola & Assocs., Inc.,* 57 Ohio St.3d 5, 6, 565 N.E.2d 540 (1991).

{¶ 54} Amber Williams and Frederick Ormsby entered into two contracts. The first was entered into in March 2005 "FOR VALUABLE CONSIDERATION that is mutually agreed upon" but unstated. (Capitalization sic.) Williams, Ormsby, their respective attorneys, the trial court, the court of appeals, and this court all agree that the March 2005 agreement is a valid, binding contract. The second contract was entered into in June 2005 "FOR VALUABLE CONSIDERATION that is mutually agreed upon" but unstated. (Capitalization sic.) The exact same consideration language is used in both contracts—yet it is sufficient in one instance but not in the other. The parties are the same, the

18

subject matter is the same, the consideration is stated the same way—but this court concludes that there is no consideration for the second contract.

{¶ 55} The first clause of the June 2005 contract resolves the issue before us. It states: "FOR VALUABLE CONSIDERATION that is mutually agreed upon, the AGREEMENT deems all other agreements concerning the items stated below to be null and void * * *." Could it be more clear? The March 2005 contract required that the house be sold and entitled Williams to, among other things, sales proceeds in excess of $324,000 and to live in the house until its sale. In consideration for giving up those rights, Williams entered into the June 2005 contract, which entitled her to different rights. How can it be argued that by voiding a contract that entitled her to specific rights, Williams was not offering consideration for the June 2005 contract, which entitled her to different rights? For instance, under the March agreement, if the property sold for $650,000, Williams would be entitled to $326,000; under the June agreement, she would be entitled to $325,000. If the property sold for $1,000,000, under the March agreement, Williams would get $726,000; under the June agreement, she would get $500,000. In that scenario, the March agreement benefits her considerably. Under the June contract, she also gives up the right to get proceeds from an immediate sale. Ormsby, meanwhile, under the June agreement does not have to vacate the house or pay Williams her equity portion to remain there—obligations of his under the March agreement. Under the June agreement, Ormsby gains more control over the timing of any sale of the house. For these benefits, he forfeits some equity in the house.

{¶ 56} I am convinced that Williams and Ormsby offered consideration for the second contract. The case is so fact specific and so riven with bizarre, if irrelevant, details, however, that it provides no meaningful guidance to the bench and bar. Accordingly, I believe that this case should be dismissed as having been improvidently accepted.

{¶ 57} I concur in the syllabus and dissent from the opinion and judgment.

_____

L. Ray Jones, for appellee.

Laribee & Hertrick, L.L.P., Michael L. Laribee, and Chris D. Carey, for appellant.

_____