[Cite as *Gardner v. Oxford Oil Co.*, 2013-Ohio-5885.]

STATE OF OHIO, MONROE COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| MICHAEL GARDNER, | ) | |
| | ) | CASE NO.  12 MO 7 |
| PLAINTIFF-APPELLEE, | ) | |
| | ) | |
| - VS - | ) | OPINION |
| | ) | |
| THE OXFORD OIL COMPANY, | ) | |
| | ) | |
| DEFENDANT-APPELLANT. | ) | |

CHARACTER OF PROCEEDINGS:     Civil Appeal from Common Pleas
Court, Case No. 2011-370.

JUDGMENT:                                    Affirmed.

APPEARANCES:
For Plaintiff-Appellee:                   Attorney Craig Sweeney
Attorney Jason Yoss
Yoss Law Office
122 North Main Street
Woodsfield, OH  43793

For Defendant-Appellant:               Attorney Scott Eickelberger
Attorney William Taylor
Attorney David Tarbert
Attorney Ryan Linn
Kincaid, Taylor & Geyer
50 North Fourth Street
P.O. Box 1030
Zanesville, OH  43702-1030

JUDGES:
Hon. Mary DeGenaro
Hon. Joseph J. Vukovich
Hon. Cheryl L. Waite

Dated:  December 20, 2013

DeGenaro, P.J.

{¶1}    Defendant-Appellant, the Oxford Oil Company, appeals the August 9, 2012 judgment of the Monroe County Court of Common Pleas granting summary judgment in favor of Plaintiff-Appellee, Michael Gardner, in an action concerning the validity of an oil and gas lease on Gardner's property.  Oxford Oil advances several arguments why the trial court erred in concluding that the lease between the parties had expired.

{¶2}    Oxford Oil's assignments of error are meritless.  Oxford Oil sold the sole well on the property along with its equipment to Gardner and assigned to Gardner all oil and gas rights except the deep rights under the lease.  The assignment—which was prepared, signed and recorded by Oxford Oil and not signed by Gardner—did not constitute a new, separate conveyance or contract.  Rather, the deep rights retained by Oxford Oil remained subject to the terms of the original lease agreement.  The habendum clause of the lease provides that after the conclusion of the primary term the lease would remain in effect "so much longer thereafter as oil, gas or their constituents are produced in paying quantities thereon, or operations are maintained on" the leased premises.

{¶3}    Further, Gardner does not have a duty to continue production after taking ownership of the well so as to preserve Oxford Oil's leasehold interest.  Oxford Oil could have prevented the situation by either drilling a deep well elsewhere on the property, or negotiating a right of first refusal provision in the event Gardner decided to take the well out of production, in order to preserve its interest; but it chose not to.  Thus, Gardner did not unilaterally terminate Oxford Oil's leasehold rights.  Finally, Gardner's use of domestic gas does not constitute production in paying quantities or operations under the lease.  Rather, it is a use incidental to the purpose of the lease.  Pursuant to the terms of the habendum clause, Oxford Oil's deep rights lapsed, and reverted to Gardner as the property owner, because Oxford Oil had ceased producing oil and gas in paying quantities, at the latest on March 23, 2001, when it memorialized the sale of the well to Gardner.  Accordingly, the judgment of the trial court is affirmed.

## Facts and Procedural History

{¶4}    Gardner is the record title owner of a certain tract of land in Monroe County, Ohio.  Gardner's predecessors-in-title, Ivan and Lulu Miracle, entered into an oil and gas

lease with Oxford Oil in 1976, which was properly recorded.  The habendum clause states the lease will run for "5 years and so much longer thereafter as oil, gas or their constituents are produced in paying quantities thereon, or operations are maintained on" all or part of the land.  Oxford Oil drilled one well on the property, known as the Ivan Miracle #1 well.

{¶5}　In February 2001, a representative of Oxford Oil informed Gardner that the well was not very productive and would be going up for sale.  Gardner then contacted Oxford Oil about purchasing the well.  By letter dated February 21, 2001, Oxford Oil's Vice President Kevin Smith offered the Miracle Well to Gardner for purchase; either stripped without production equipment for $4,100.00 or completely equipped as is, but without gas meters, for $8,050.00.

{¶6}　Accepting the offer for the completely equipped well, Gardner tendered a check for $8,050.00 to Oxford Oil, writing "oil well" in the memo line.  To memorialize the sale of the Miracle Well, Oxford Oil drafted, executed and recorded in the Monroe County Recorder's Office an assignment and bill of sale.  The assignment was dated March 23, 2001 and filed that same day.  It provides in relevant part:

> KNOW ALL MEN BY THESE PRESENTS:
>
> That the undersigned, THE OXFORD OIL COMPANY of 4900 BOGGS ROAD, ZANESVILLE, OH  43701, ASSIGNOR, for One Dollar ($1.00) and other valuable considerations received to its satisfaction, does hereby sell, assign and set over unto MIKE GARDNER of 44799 STATE ROUTE 145, LEWISVILLE, OH  43754, ASSIGNEE, a portion of its right, title and interest in and to an Oil and Gas Lease from Ivan and Lulu B. Miracle to the Oxford Oil Company dated July 21, 1976 and recorded in Volume 111, Page 13 of the Monroe County Recorders Lease Records.
>
> Along with the well known as the Ivan Miracle #1, Permit 2182 along with all surface and downhole equipment.
>
> The Oxford Oil Company hereby retains all deep rights from the

bottom of the producing zone to the center of the earth.

**{¶7}** The assignment further states "ASSIGNEE, for himself, his successors and assigns assumes full responsibility for the management and operation thereof and shall indemnify and hold harmless ASSIGNOR from any and all loss, cost damage and claims including reasonable Attorney's fees and cost of defense."

**{¶8}** The assignment was not signed by Gardner. Gardner did sign a release discharging Oxford Oil, its agents, contractors, successors and assigns "from any and all claims for actual and consequential damages past, present or future, which can or may ever be asserted, arising out of operations for oil and gas on the Miracle Farms property situated in the Franklin Township, Monroe County, Ohio." Gardner filed the required administrative paperwork with the Ohio Department of Natural Resources to amend the ownership records of the actual well, which was signed by both parties.

**{¶9}** The record is unclear as to the exact date Oxford Oil last produced oil or gas in paying quantities from the Miracle Well. However, the last possible date would have been on March 23, 2001, the date it filed the assignment memorializing the sale of the well to Gardner. This had been the only well Oxford Oil had drilled on the property pursuant to the lease it executed with the Miracles in 1976. Oxford Oil never drilled another well elsewhere on the property.

**{¶10}** After purchasing the Miracle Well, Gardner never commenced operations. He testified during depositions that the engine powering the pump jack was malfunctioning from the time he purchased the well, and that he tried unsuccessfully to fix it. Sometime during the spring of 2011, Gardner removed the pump jack from the Miracle Well and sold it. Equipment related to the pump jack, including a large oil tank and a smaller tank, were also removed from the property by the buyer; only the well head remained. Gardner continued to obtain gas for buildings on his property during this time, via a domestic gas line attached to the well head.

**{¶11}** Shortly after selling the pump jack, Gardner's counsel sent Oxford Oil a letter demanding a release of the lease and stating that if it did not do so, he would file an

affidavit of forfeiture. It was Gardner's position that the lease had expired due to Oxford Oil's failure to produce oil or gas from the leased premises since 2001. Correspondence was exchanged between the parties; Gardner filed a notice of forfeiture, and Oxford filed an affidavit and notice that the oil and gas lease had not been forfeited in response.

{¶12} As a result, on October 6, 2011, Gardner filed a complaint seeking a declaratory judgment that all of Oxford Oil's right, title and interest in and to the property had expired. Oxford filed an answer and counterclaim and the parties conducted discovery. The parties filed cross-motions for summary judgment; on August 9, 2012, the trial court granted Gardner's and denied Oxford Oil's.

## Summary Judgment

{¶13} On appeal, Oxford Oil raises the following four assignments of error:

{¶14} "The trial court erred in finding that the lease between the parties has expired and that Oxford no longer has an interest in the deep right."

{¶15} "The trial court erred in finding that the well has not been producing in paying quantities or that operations are not maintained thereon."

{¶16} "The trial court erred in finding that Plaintiff-Appellee can unilaterally cut off Oxford's rights by removing production and disconnecting [the] sales line"

{¶17} "The trial court erred in supporting its judgment on Plaintiff-Appellee's argument that Defendant-Appellant Oxford Oil regarded the subject lease and assignment as indefinite."

{¶18} The overarching issue in this appeal is whether the trial court erred in concluding that the oil and gas lease between the parties expired pursuant to the terms of the habendum clause and granting summary judgment in Gardner's favor for that reason. Although Oxford Oil lists four assignments of error, its brief focuses on three main arguments: (1) that the assignment constitutes a separate agreement, not subject to the terms and conditions of the original lease; (2) assuming the assignment is subject to the terms and conditions of the lease, Oxford Oil's interest would remain in effect until Gardner plugs and abandons the well; and, (3) assuming the assignment is subject to the terms and conditions of the lease, Gardner's use of domestic gas constitutes "production

in paying quantities" or "operations," sufficient to preserve the validity of the lease. Thus, each issue will be discussed in turn for clarity of analysis.

{¶19} Under Civ.R. 56, summary judgment is only proper when the movant demonstrates that, viewing the evidence most strongly in favor of the nonmovant, reasonable minds must conclude no genuine issue as to any material fact remains to be litigated and the moving party is entitled to judgment as a matter of law. *Doe v. Shaffer*, 90 Ohio St.3d 388, 390, 738 N.E.2d 1243 (2000). A fact is material when it affects the outcome of the suit under the applicable substantive law. *Russell v. Interim Personnel, Inc.*, 135 Ohio App.3d 301, 304, 733 N.E.2d 1186 (6th Dist.1999). Only the substantive law applicable to a case will identify what constitutes a material issue, and only the disagreements "over facts that might affect the outcome of the suit under the governing law" will prevent summary judgment. *Byrd v. Smith*, 110 Ohio St.3d 24, 2006-Ohio-3455, 850 N.E.2d 47, ¶12, citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party moving for summary judgment "bears the initial responsibility of informing the trial court of the basis for the motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of fact on a material element of the nonmoving party's claim." *Dresher v. Burt*, 75 Ohio St.3d 280, 296, 662 N.E.2d 264 (1996) (emphasis removed). The nonmoving party has the reciprocal burden of specificity and cannot rest on the mere allegations or denials in the pleadings. *Id.* at 293.

{¶20} With respect to the standard of review, an appellate court reviews a trial court's summary judgment decision de novo, applying the same standard used by the trial court. *Ohio Govt. Risk Mgt. Plan v. Harrison*, 115 Ohio St.3d 241, 2007-Ohio-4948, 874 N.E.2d 1155, ¶5. Oxford Oil argues in its brief in a conclusory fashion that there are "genuine issues of material fact" that remain to be decided, but fails to specify precisely what facts are in dispute. This leaves us only with legal issues to review.

### The Assignment

{¶21} First, Oxford Oil asserts that the assignment and bill of sale between the parties is its own separate contractual agreement that is not subject to the terms of the oil

and gas lease. More specifically, Oxford Oil claims that the assignment does not condition its retention of the deep rights upon "production in paying quantities."

{¶22} Oxford Oil argues that the assignment has the legal effect of a novation; specifically, that it is a separate agreement in which Gardner granted Oxford Oil the deep rights in the property. "A contract of novation is created where a previous valid obligation is extinguished by a new valid contract, accomplished by substitution of parties or of the undertaking, with the consent of all the parties, and based on valid consideration." *Williams v. Ormsby*, 131 Ohio St.3d 427, 2012-Ohio-690, 966 N.E.2d 255, ¶18. A "novation can never be presumed but must be evinced by a clear and definite intent on the part of all the parties to the original contract to completely negate the original contract and enter into the second." *Id.*

{¶23} Further, "[B]ecause a novation is a new contract, it too must meet all the elements of a contract." *Id.* at ¶19. "Essential elements of a contract include an offer, acceptance, contractual capacity, consideration (the bargained for legal benefit and/or detriment), a manifestation of mutual assent and legality of object and of consideration." *Kostelnik v. Helper*, 96 Ohio St.3d 1, 2002-Ohio-2985, 770 N.E.2d 58, ¶16 (citation omitted).

{¶24} Here, there is evidence of an offer, via the letter from Smith, Oxford Oil's Vice President, to Gardner outlining the terms of the sale. The offer letter states that "the purchase price for the [W]ell would be $8,050.00," and does not include any mention of the deep rights. There is evidence of an acceptance by Gardner via the check he tendered to Oxford Oil for $8,050.00. In the memo line, he wrote "oil well," again with no mention of the deep rights. The consideration exchanged between the parties is the $8,050.00 paid in exchange for the well and the pump equipment; nothing more.

{¶25} The assignment and bill of sale is the only written reference to the retention of the deep rights and that was only signed by a representative of Oxford Oil. There is no evidence in the record that Gardner was told about these documents, offered any consideration for the deep rights retained by Oxford Oil, or that he had notice that the documents were recorded. Absent evidence of mutual assent by both parties the

assignment does not constitute a novation. Nor does it constitute its own separate contractual agreement; it merely indicates that Oxford Oil sold the well and well equipment to Gardner, and assigned him some of its rights under the lease agreement, retaining only the deep rights. Accordingly, this argument is meritless. Oxford Oil's retention of the deep rights remains subject to the terms of the lease agreement.

## Lease Termination pursuant to the Habendum Clause

{¶26} Given our resolution of the novation issue; that the terms of the assignment are conditioned upon the terms of the Miracle Lease, we turn to Oxford Oil's next argument: that the lease and Oxford Oil's deep rights terminate only when Gardner plugs and abandons the well. Oxford Oil further complains that the trial court erroneously permitted Gardner to unilaterally cut off its deep rights by capping the Miracle Well and taking it out of production. Oxford Oil mischaracterizes the trial court's decision.

{¶27} The primary lease term of 5 years had long expired. The habendum clause of the lease also provides for a secondary term, that the lease will run for "and so much longer thereafter as oil, gas or their constituents are produced in paying quantities thereon, or operations are maintained on" all or part of the land. In the assignment, Oxford Oil transferred to Gardner "a portion of its right, title and interest in and to [the] Oil and Gas Lease," retaining only the "deep rights from the bottom of the producing zone to the center of the earth." Reading these two provisions in pari materia, Oxford Oil's deep rights under the lease would remain in effect so long as oil or gas is produced in paying quantities or operations are maintained on all or part of the leased premises by Oxford Oil.

{¶28} The trial court, finding that Oxford Oil provided no evidence to the contrary, held that "there has been no production of oil and/or gas in paying quantities from the Well since at least the time of the Assignment to Gardner * * *." The trial court concluded that the Lease had therefore expired. The trial court's conclusion was correct. There is nothing in the lease dictating Oxford Oil's interpretation that the lease terminates only when Gardner plugs and abandons the well. The assignment was dated and recorded on March 23, 2001. This was the last possible date Oxford Oil could have produced oil and

gas in paying quantities from the Miracle Well. Nor did Oxford Oil drill another well on the property before selling the Miracle Well to Gardner in order to preserve its deep mineral rights as contemplated by the habendum clause. Thus, as a result of Oxford Oil's inaction, the Miracle Lease expired in 2001, with Oxford Oil's interest lapsing and reverting back to Gardner as the property owner.

{¶29} Oxford Oil's contention that Gardner unilaterally extinguished its deep rights is meritless in light of the terms of the assignment, which it drafted. Oxford Oil could have drilled a productive deep well elsewhere on the 109 acres to preserve its leasehold interest before it sold the Miracle Well to Gardner. Alternatively, it could have negotiated a right of first refusal provision in the assignment to repurchase the well from Gardner in the event he would choose to take the Miracle Well out of production. Either alternative would have guarded against this very situation. And the assertion that the assignment created an obligation for Gardner to continue production to maintain Oxford Oil's interest is likewise meritless. There is no provision in the assignment creating such an obligation; the language Oxford chose to employ in the assignment and Oxford's own inaction terminated its leasehold rights.

{¶30} This case is similar to *Yoder v. Stocker & Sitler Oil Co.*, 5th Dist. No. CA-465, 1993 WL 95604 (Mar. 30, 1993) (*Yoder I*). In *Yoder I*, two shallow wells were drilled on the entirety of the leased premises. Both shallow wells were assigned and subleased to other producers while the oil and gas companies retained the deep rights. Subsequently, the landowner was assigned one of the two wells. The landowner used the well solely for domestic purposes and the other well was later plugged by one of the oil and gas companies. The landowner filed an action to cancel the lease based on lack of production and the oil and gas companies filed for summary judgment which the trial court granted. *Id.* at *1-2

{¶31} The habendum clause in *Yoder I* provided four conditions under which the lease would remain valid beyond the primary term of ten years, which had undisputedly expired. "The four methods [were]: Lease paragraph two, as long as operations for oil or gas are being conducted on the premises; lease paragraph two, oil and gas is found in

paying quantities (sic); lease paragraph 14, so long as production continues; or lease paragraph fourteen, a restart of operations during the secondary term within 60-days, in obtaining production in paying quantities." *Id.* at *2.

{¶32} The trial court found that the production of gas from the remaining active well constituted paying quantities, because an economic value was passing to the landowner in using the well to supply gas for their home. *Id.* On appeal, the landowner contended that "the limited swabbings (distribution of free gas) [did] not constitute production in paying quantities within the meaning of the lease as to keep the lease in force after the primary term." *Id.* The Fifth District Court of Appeals agreed with the landowner, holding that: "the appellees [oil and gas companies] did not keep their rights viable under the lease agreement." *Id.* at *3.

{¶33} The Fifth District did not impose any obligation upon the landowner to continue to produce the well; it held to the contrary:

> [T]he lease is intended to give appellees [the oil and gas companies] the
> right to drill for, produce, and market this oil and gas. For this reason, it is
> appellees' [the oil and gas companies'] operations for oil or gas to which
> [the lease] refers. Likewise, the production of oil and gas must be in
> "paying quantities" to appellees. The benefit that the [landowners] derive
> from their well for their own use, admittedly a non-commercial use, does
> not impact on this lease to extend it past the ten-year primary term.

*Yoder I* at *3.

{¶34} Here, as in *Yoder I*, the only well on the property was sold and ownership assigned to the landowner, Gardner. Gardner has only used the well for the incidental purpose of obtaining gas for his personal use; in other words, distribution of gas for domestic rather than commercial purposes. In *Yoder I*, the court of appeals permitted the landowner to cancel the lease and the related assignments, not because of the landowner's unilateral actions, but because "the [oil and gas company] did not keep their rights viable under the lease agreement," by failing to drill and produce another well for

commercial purposes. Thus, preservation of drilling rights under the terms of a habendum clause is dependent upon the actions of the oil and gas company, in this case Oxford Oil. An owner's incidental use of gas for domestic purposes does nothing to preserve or defeat the oil and gas company's interest.

{¶35} Gardner does not have a duty to continue production after taking ownership of the well so as to preserve Oxford Oil's leasehold interest. Oxford Oil could have prevented this situation had it drilled a deep well elsewhere on the property or negotiated a right of first refusal provision in the event Gardner decided to take the well out of production, but Oxford Oil chose not to take these steps. Accordingly, Oxford Oil's argument that Gardner unilaterally terminated Oxford Oil's leasehold rights is meritless.

### Production in Paying Quantities

{¶36} Oxford Oil's final alternative argument is that the lease continues to be viable pursuant to the terms of the habendum clause because there is production in paying quantities and/or operations maintained thereon. Specifically, Oxford Oil asserts that Gardner's use of the well to provide gas to three separate buildings on his property is equivalent to either production in paying quantities or operations under the lease.

{¶37} The Ohio Supreme Court's seminal decision defining the phrase production in paying quantities is *Blausey v. Stein*, 61 Ohio St.2d 264, 400 N.E.2d 408 (1980):

> The term "paying quantities," when used in the habendum clause of an oil and gas lease, has been construed by the weight of authority to mean 'quantities of oil or gas sufficient to yield a profit, even small, to the lessee over operating expenses, even though the drilling costs, or equipping costs, are not recovered, and even though the undertaking as a whole may thus result in a loss.

(Citation omitted.) *Id.* at 265-266.

{¶38} In *Yoder I*, *supra*, the Fifth District held that *non-commercial* use of free domestic gas by a landowner did not constitute production in paying quantities pursuant to the habendum clause of an oil and gas lease. In this case, Gardner was using the

domestic gas arguably for a commercial purpose, i.e., to fuel a rental home on his property. Oxford Oil argues that this commercial purpose transforms the use into production in paying quantities.

{¶39} The Eleventh District's analysis in *Tisdale v. Walla*, 11th Dist. No. 94-A-0008, 1994 WL 738744 (Dec. 23, 1994), is instructive on this point and dispels Oxford's Oils argument. In *Tisdale*, a dispute arose between several oil and gas lessors, whose properties has been placed into a drilling unit or common pool. A well had been drilled on property belonging to Walla. That well was formerly commercially productive, but for over twenty years prior to the commencement of the lawsuit all commercial drilling by the lessee had ceased. The Tisdales and Walla continued to take free gas from the well for domestic purposes and, in the case of Walla, for pig farming purposes. Walla wanted to prevent the Tisdales from continuing to enjoy a free right of way to the gas well located on Walla's property. Accordingly, Walla sought a judicial declaration that the leases had expired pursuant to their habendum clauses, which stated: "TO HAVE AND TO HOLD said premises for the purposes aforesaid during the term of ten (10) years from the date hereof [called 'primary term'], and as long thereafter as drilling operations for oil and gas are conducted thereon, hereunder, or oil or gas is produced therefrom hereunder, and-or so long as said premises are used for underground storage of gas as herein provided." *Id.* at *2.

{¶40} The Eleventh District held that the parties' production and use of gas for domestic and *farming* purposes did not count toward the calculation of gas produced in paying quantities, essentially taking the view that production pursuant to the lease must stem from *commercial drilling* operations, not merely any commercial use of the domestic gas. *Id.* at *3. In other words, the court in *Tisdale* concluded that these types of uses by the lessors were incidental to the purpose of the lease; thus only commercial oil and gas production by the lessee oil and gas companies would preserve their interest under the habendum clause. We agree with this rationale.

{¶41} From a policy perspective, the use of domestic gas is an incidental use, not the primary purpose of a well. Gardner's use of gas for his rental property is analogous

to Walla's use of gas for his pig farming operation in *Tisdale*. Both uses are incidental to the purpose of the lease: commercial production of gas by the lessee for sale to third parties. The analysis of our sister district in *Tisdale* is persuasive. We hold that Gardner's use of the gas for his home, garages and rental property does not count towards the calculation of gas produced in paying quantities pursuant to the habendum clause. Rather, it is a use incidental to the purpose of the lease, and does nothing to preserve Oxford Oil's deep rights.

### Maintaining Operations on the Leasehold Property

{¶42} Nor does Gardner's incidental use of domestic gas from the well constitute operations under the lease. In *Yoder I,* the oil and gas lease provided, among other things, that the lease would continue past the primary term "as long as operations for oil or gas [were] being conducted on the premises." *Yoder I,* 1993 WL 95604 at *2. In that case, as here, the lessee had retained only the deep rights and the landowner had been assigned the only producing well and chose to take it out of production and use it for domestic gas purposes only. The Fifth District concluded that operations meant those conducted by the oil and gas company, not the landowner, even though the landowner had been assigned the rights to the well; the landowner's use of domestic gas did not constitute operations under the terms of the lease. *Id.* at *3. Again, we are persuaded by this rationale. Gardner's domestic gas use was incidental to the purpose of the lease. Operations, just as production in paying quantities, are assessed from the perspective of the lessee oil and gas company; the party under the lease with the right and duty to drill for oil and gas. The incidental use of gas by the property owner is insufficient to constitute operations.

{¶43} Finally, the record undercuts Oxford Oil's argument. At the time the well and equipment was sold to Gardner, Oxford Oil removed the meter from the well. Additionally, at the time the well was in commercial production, there was no meter attached to the gas running to the buildings for Gardner's domestic use. This is additional indicia that Gardner's use was not only incidental to the purpose of the lease; it could not serve as a basis to determine whether gas was being produced in paying quantities.

Without a meter, the amount of gas being produced could not be measured; moreover, Gardner testified in his deposition that the leases for his rental property provided for free gas.

**{¶44}** Accordingly, the trial court correctly determined that because there was no production in paying quantities and/or operations maintained on Gardner's property by Oxford Oil, pursuant to the terms of the habendum clause, Oxford Oil's deep well rights have terminated.

### Conclusion

**{¶45}** In sum, the trial court properly granted summary judgment in favor of Gardner and thus Oxford Oil's assignments of error are meritless. Oxford Oil sold the sole well on the property along with its equipment to Gardner and assigned to Gardner all oil and gas rights except the deep rights under the lease. The assignment—which was prepared, signed and recorded by Oxford Oil and not signed by Gardner—did not constitute a new, separate conveyance or contract. Rather, the deep rights retained by Oxford Oil remained subject to the terms of the original lease agreement. The habendum clause of the lease provides that after the conclusion of the primary term the lease would remain in effect "so much longer thereafter as oil, gas or their constituents are produced in paying quantities thereon, or operations are maintained on" the leased premises.

**{¶46}** Further, Gardner does not have a duty to continue production after taking ownership of the well so as to preserve Oxford Oil's leasehold interest. Oxford Oil could have prevented the situation by either drilling a deep well elsewhere on the property, or negotiating a right of first refusal provision in the event Gardner decided to take the well out of production, in order to preserve its interest; but chose not to. Thus, Gardner did not unilaterally terminate Oxford Oil's leasehold rights.

**{¶47}** Finally, Gardner's use of domestic gas does not constitute production in paying quantities or operations under the lease. Rather, it is a use incidental to the purpose of the lease. Pursuant to the terms of the habendum clause, Oxford Oil's deep rights lapsed, and reverted to Gardner as the property owner, because Oxford Oil had ceased producing oil and gas in paying quantities, at the latest on March 23, 2001, when

it memorialized the sale of the well to Gardner. Accordingly, the judgment of the trial court is affirmed.

Vukovich, J., concurs.

Waite, J., concurs in judgment only, with concurring in judgment only opinion.

Waite, J., concurring in judgment only.

{¶48} Although I concur in the ultimate judgment, I have concerns about some of the legal analysis used in the Opinion. One of the key aspects of this case, possibly the most important factual determination, was whether the Miracle well was producing in paying quantities (or at least operating) at the time Michael Gardner filed his declaratory judgment complaint. The habendum clause in the parties' lease stated that the lease would continue for five years and then remain in effect as long as, (1) oil or gas was produced in paying quantities, or (2) if operations were maintained on the leasehold. The initial period of an oil and gas lease is usually referred to as the primary term, which in this case was five years. For the lease to continue after the primary term into the secondary term, the conditions of the habendum clause must be met: "[i]If after the expiration of the primary term the conditions of the secondary term are not continuing to be met, the lease terminates by the express terms of the contract herein and by operation of law and revests the leased estate in the lessor." *American Energy Services, Inc. v. Lekan*, 75 Ohio App.3d 205, 212, 598 N.E.2d 131 (5th Dist.1992). The secondary term of the lease continues indefinitely as long as the conditions of the habendum clause are met. *Id.*

{¶49} The only evidence in the record relating to production and operations involves the Miracle well, the sole well on the property. The majority seems to conclude that the mere fact that Oxford Oil assigned the well to Mr. Gardner meant that production in paying quantities, as well as oil and gas operations, stopped on the date of assignment. In my opinion, there is no direct correlation between an assignment of leasehold rights and the concept of production in paying quantities in an oil and gas lease. The significant date for purposes of the habendum clause is the date on which production and

operations ceased. Once the well was assigned to Gardner, he controlled whether there was continued production and operations under the lease. The evidence shows that he dismantled the well and discontinued all operations, except for drawing a small amount of gas for personal use. Production or the lack of production was determined by what Gardner did with the well, not by the date of its assignment.

{¶50} Oxford Oil's primary line of argument in its second assignment of error is that it was unfair for Gardner to stop using the well and then claim that the lease terminated because of non-production of the well. Oxford Oil relies on a number of more or less equitable theories as to why Gardner's failure to operate the well should not be used to the detriment of Oxford Oil's rights under the lease. Oxford Oil refers or alludes to such concepts as: breach of the duty to produce and market in a workmanlike fashion; breach of implied duty of production; unilateral impairment of lease rights; equitable estoppel; liability for preventing or hindering performance; unclean hands; and the duty of good faith and fair dealing. Oxford Oil believes that equitable relief is appropriate to correct the unilateral and detrimental actions taken by Gardner. The problem with all of these arguments is that it was Oxford Oil that assigned away its rights, sold its well, failed to develop any other portion of the 108-acre leasehold, and admitted that the Miracle well was unproductive. Equitable relief is not available to relieve a party from the natural and expected consequences of its own actions. *Ahmed v. Scott*, 65 Ohio App.2d 271, 276-277, 418 N.E.2d 406 (6th Dist.1979). Therefore, even if we assume that it was Gardner who decided to stop production, rather than using the date of assignment as the date that production stopped, there is nothing in the record to support any type of equitable relief. Therefore, I agree with the majority that the judgment should be affirmed, although for other reasons.