[Cite as *Cameron v. Mark W. Liberty Midstream & Resources, L.L.C.*, 2024-Ohio-5279.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## JEFFERSON COUNTY

DAVID E. CAMERON,

Plaintiff-Appellant,

v.

MARK WEST LIBERTY MIDSTREAM & RESOURCES, LLC ET AL.,

Defendants-Appellees.

---

**OPINION AND JUDGMENT ENTRY**
Case No. 23 JE 0020

---

Civil Appeal from the
Court of Common Pleas of Jefferson County, Ohio
Case No. 18 CV 258

**BEFORE:**
Cheryl L. Waite, Carol Ann Robb, Mark A. Hanni, Judges.

---

**JUDGMENT:**
Reversed and Remanded.

---

*Atty. Michael D. Dortch*, *Atty. Richard R. Parsons*, *Atty. Justin M. Dortch*, Kravitz, Brown & Dortch, LLC and *Atty. Jeffrey Orr Brown*, for Plaintiff-Appellant

*Atty. Christopher R. Nestor* and *Atty. David R. Overstreet*, Overstreet & Nestor, LLC, for Defendants-Appellees

Dated: November 1, 2024

**WAITE, J.**

{¶1} Appellant David Cameron appeals a September 27, 2023 judgment entry of the Jefferson County Court of Common Pleas. Appellant argues the court erroneously held that an agreement entered with Appellees Mark West Liberty Midstream & Resources and Jefferson Gas Gathering Co., LLC contained a document that created the final path of a right-of-way granted for purposes of installing a pipeline. In addition, Appellant argues that Appellees breached their agreement to provide electric fencing to protect his cattle. For the reasons that follow, Appellant's arguments have merit and the matter is reversed and remanded for further proceedings consistent with this Opinion.

<u>Factual and Procedural History</u>

{¶2} This matter involves a complicated right-of-way easement created for the purposes of installing a pipeline through several properties in Mount Pleasant, Jefferson County. Appellant owns a cattle farm which is comprised of approximately 129.49 acres of land. Appellee Mark West is a midstream gathering company that removes gas from various wells and transports it to sales lines.

{¶3} In essence, Mark West needed to secure several right-of-way agreements in the Mount Pleasant area of Jefferson County to install at least several hundred feet of pipeline in order to gather gas from certain wells and allow it to travel for sales purposes. The general procedure employed by Mark West was laid out during the testimony of Gregory Gbur, a Mark West employee familiar with both the company policies and the events surrounding the instant case.

{¶4}    When Mark West seeks to install pipes, they first review GoogleEarth maps to plan a route for the proposed pipeline.  (Trial Tr., p. 43.)  They then hire a land company to complete a "short title" search to determine who owns property in the proposed path.  They approach these landowners, seeking a right-of-way easement which would allow them to install the pipeline underground.  If the landowner declines, the company must undertake significant rerouting efforts to go around that property.  Thus, Mark West must have a large number of landowners cooperate in order to install its pipeline.

{¶5}    If a landowner agrees to provide a right-of-way easement, the landowner is compensated monetarily by means of a price per foot of pipeline.  The landowner often demands certain stipulations as to where the pipeline is placed, how it is constructed, and other considerations.  Gbur testified that he typically accompanies the landowner and walks the planned route to show the proposed path and determine if there are any concerns.  Gbur acknowledged that, as a result of this process, the pipeline path often changes.  This is typically due to concerns of the landowner, concerns of Mark West or the construction company, or environmental factors.   Until the land is fully traversed and the company has an idea of the underground configuration of the land (which will also impact final placement), it is impossible to know the final pipeline route until this process is fully completed.  For this reason, while the landowner signs an initial document, referred to as "Exhibit A," which reflects a proposed placement, the path depicted on that agreement is not the final pathway.  Exhibit A is attached to the right-of-way agreement.  Although it has been referred to as "Exhibit A" throughout the proceedings, at trial it was listed as Exhibit B.  Thus, the citations to this document are inconsistent throughout the proceedings.

**{¶6}** Each time the proposed path changes, a new Exhibit A is generated, is typically signed by the landowner for tentative approval of the changes, and a survey is completed. Then, the right-of-way is roughly marked on the property by "survey stakes" and the parties transverse this proposed pathway as staked. Around this time, documents referred to as "alignment sheets" are generated. These sheets are the first visualization of the path reduced to paper. As with the Exhibit A document, these sheets are typically presented to the landowner for approval and signature. Thereafter, barring any other concerns or problems, construction begins.

**{¶7}** Construction is initiated by digging a trench three feet or more deep where the pipeline is supposed to be placed. Then the "mechanical completion" phase begins. During this stage, the pipeline is tested and is "ready to throw product," but remains uncovered. (Trial Tr., p. 64.) The process next moves to the "restoration" phase, in which the right-of-way area is restored as close as possible to its prior above-ground condition. Typically this process involves at least seventy percent regrowth of vegetation.

**{¶8}** Often, multiple pipelines are placed within the same right-of-way location to allow Mark West to install as much pipeline as possible and avoid having to enter into more agreements with other landowners. These pipelines are required by law to be at least fifty feet apart from one another. The first pipeline laid is typically placed right next to the boundary lines to allow for as many pipelines as possible.

**{¶9}** In the instant case, Mark West approached Appellant and inquired if he would be willing to agree to a 100-foot wide right-of-way and an access road along his 129.49 acre cattle farm. Initially, Appellant was reluctant, due to concerns regarding his cattle operations and because he did not want his property disturbed. He took three

months to come to a decision. It appears he initially declined to provide an easement, but the parties were able to eventually reach an agreement that an easement would be allowed. Mark West agreed to pay Appellant $60 per foot of pipeline.

{¶10} Mark West employees testified that several stipulations were reached in this matter. Among the stipulations, Mark West agreed to install electronic fencing to keep Appellant's cattle from crossing into the construction area as they grazed, an important concern on the part of Appellant. Although both parties admit an agreement was reached on this issue, it was not reduced to writing. Mark West did, partially, install a fence. Problematically, Mark West did not complete this fence and the electronic feature did not work. Mark West attempted several repairs on the electronic feature but they were unsuccessful. Because the fence was not completed and did not work, Appellant was forced to keep his cattle in barns throughout the entire construction process, where he had to extend extra efforts to clean the barns and was forced to bring in hay to feed his cattle at his own additional expense. (Trial Tr., p. 121.)

{¶11} Gbur testified that he and Appellant conducted a first walk-through of the property to determine whether either party had any concerns regarding the topography in the proposed path. According to Appellant, he voiced several concerns during this process. Mark West employees testified that several versions of "Exhibit A" were drafted and signed throughout the process for various reasons. At some point, Appellant was presented with a revised version of Exhibit A that he refused to sign. It is unclear why this version was created, but it appears it was the result of some sort of construction or environmental reason, as Mark West employees testified that, along with landowner requests, these are the typical reasons to alter the proposed route of the easement.

Altering its usual practice, instead of working out a mutually acceptable resolution, Mark West decided to proceed to construction based on the prior version of Exhibit A, despite the fact that there was some problem with this route, because otherwise a new version would not have been proposed and created. Appellant objected orally, several times, to this path Mark West imposed after construction began.

{¶12} Although documents referred to as "contact diaries" detail many of Appellant's oral objections, Gbur testified that he was unsure as to when Appellant first raised his objections. A former Mark West employee, Brandon Kinner, testified that when he first became aware that Appellant objected, he accompanied Appellant to the site. The pipe had been laid but was still uncovered. Kinner also confirmed that the fence never worked and he understood that caused problems, as it prohibited Appellant's cattle from grazing.

{¶13} On June 21, 2017, Appellant sent a letter to Mark West stating that the pipeline path as it was being constructed was outside of the agreed right-of-way. A Mark West employee testified that this type of complaint rarely occurs. He could remember only one other occasion where this occurred, and the pipelines were moved to accommodate the landowner in that instance. However, in this case, Mark West insisted the path was in the right-of-way. Mark West approached Appellant with an "alignment sheet," which he refused to sign. Again, these sheets were typically agreed-to and signed prior to construction.

{¶14} Mark West ended up installing a total of 85.41 feet of pipeline on Appellant's property. At least two pipelines were installed within what Appellees deemed to be the path of the easement. According to Mark West, Pipeline One was installed right next to

what they considered to be the boundary line. Pipeline Two was installed fifty feet from that location. According to Gbur, mechanical completion occurred as to Pipeline One at the end of January of 2017. Restoration occurred in July of 2017. It is unclear when mechanical completion of Pipeline Two occurred, but restoration of that line occurred in November of 2017.

{¶15} On June 14, 2018, Appellant filed a complaint against Mark West and Jefferson Gas Gathering, alleging claims rooted in trespass. On November 6, 2019, Appellant filed an amended complaint. On February 13, 2019, Appellant filed a second amended complaint. The first count of the second amended complaint sought damages for a trespass, and to have the pipeline relocated to an area within an agreed upon right-of-way. The second claim asserted "[t]he actions of the Defendants were willful, wanton, reckless and malicious and constitute a continuing trespass." (Complaint, p. 5.) The final count addressed the issues concerning the fence, and sought damages for the costs incurred caring for cattle without the protection of a properly constructed electric fence.

{¶16} On February 5, 2020, Appellees filed a motion to bifurcate the trial pursuant to R.C. 2315.21(B). On that same date, Appellees also filed a "Motion to Bifurcate Claims for Declaratory Relief for Initial Bench Trial." In these motions Appellees sought to have the trial court first hold a bench trial to decide whether the version of Exhibit A they relied on was ambiguous. Once that decision was reached, Appellees sought a jury trial on the issue of whether a trespass occurred and, if so, whether damages would be appropriate. Appellant did not object to either motion. The trial court granted both motions in a single judgment entry, which also disposed of other general issues.

**{¶17}** While the court agreed to hold two "trials," at some point it unilaterally converted the bench trial into "oral argument." While it is unclear what direction the court gave the parties regarding this "oral argument," the trial court did provide the parties with an opportunity to file briefs. It does not appear they were permitted to introduce witness testimony. Hence, without actually stating this, the trial court apparently intended to decide the matter regarding the path of the easement by means of summary judgment.

**{¶18}** A hearing on the matter was initially delayed due to the COVID pandemic. However, the court was able to hold oral argument on the right-of-way issue on August 10, 2020. At oral argument, the right-of-way documents, at least seven versions of Exhibit A, and a deposition from Gbur were admitted into evidence, however no witness testimony was produced by any party.

**{¶19}** On August 12, 2020, the court determined that the last signed version of "Exhibit A" was unambiguous and was generally intended to create the final description of the right-of-way that bound the parties. The court determined that as the agreement specifically indicated the map provided was "not to scale" Appellees were permitted some leeway to decide the final location. Although the court relied on Exhibit A entirely, it is apparent from the filings to the court and later testimony that Exhibit A was never intended to reflect final placement, allowing construction to proceed. The court determined that Appellees' version of Exhibit A provided the "measuring stick" for the trespass claims.

**{¶20}** Following this decision, which it appears the court and parties treated as final, the parties agreed that amending the complaint was not possible at that juncture. Thus, Appellant waived his jury request on the remaining issues and they were addressed before the trial court in a one-day bench trial. At trial, in addition to witness testimony,

results from a professional surveyor were introduced. Those results appear to show an encroachment of approximately 1.36 acres onto one section of Appellant's property near the Appellant/Griffith property line that is not a part of the right-of-way depicted by Appellees' version of Exhibit A as adopted by the trial court. The survey also appeared to show an encroachment of roughly .96 acres in what was referred to as the "Zelek Corner," where Appellant's property met the neighboring Zelek property. Thus, the survey reflected a total of approximately 2.32 acres of potential trespass.

**{¶21}** In a somewhat confusing judgment entry, the court ruled in favor of Appellees on both the trespass claim at the Zelek corner and the issue regarding construction of the fence and the damages sought. As to the trespass issue, the court appeared to find that a trespass occurred, but determined that the trespass was only a few feet removed from the right-of-way, and so was not actionable based on its earlier decision that Exhibit A allowed for variance. It appears the court determined that the parties had loosely come to an agreement as to the location of the right-of-way, and found that a small violation of that agreement was not inconsistent with the parties' imprecise measurements. As to the fence, while the court found that Appellant proved all elements for an oral contract at trial, it ultimately determined that the agreement to construct a fence was gratuitous, and was not actionable.

ASSIGNMENT OF ERROR NO. 1

The trial court erred prior to trial when it concluded as a matter of law that the parties' contract unambiguously depicts the route of the pipeline right-of-way across Appellant's property.

{¶22} Appellant first takes aim at the trial court's ruling that the last signed version of Exhibit A unambiguously reflects the parties' agreement on final placement of the easement. Importantly, in this assignment of error, Appellant challenges only the trial court's first ruling, which occurred prior to trial. The court decided this version of Exhibit A constituted a "measuring stick;" it vaguely determined where the parties intended to have pipeline installed but allowed for deviation. This decision significantly limited the issues Appellant was able to raise at the later bench trial. After the court's initial ruling, Appellant believed he could only argue whether the pipeline was installed within the general path depicted on Appellees' version of Exhibit A or whether it encroached on areas outside of that path.

{¶23} Appellant contends that the sole and limited purpose of every version of Exhibit A was to provide a rough, preliminary idea as to where the easement for the pipeline path might be located, with the understanding that a determination on placement could change during the routine route development process. However, final agreement on the exact location of the pipeline location would be reached later in the process, prior to construction. At the time of signing the larger easement agreement, the parties were both unsure of the nature of the terrain in the general vicinity where the pipeline was projected to be installed. Hence, they agreed to follow and abide by the typical practice of Mark West, which was to jointly traverse the area to observe the terrain, convey any concerns about the topography to one another, and that final approval of location would be reached prior to actual construction. Appellant contends that because of this practice, the rudimentary drawing depicted on the various Exhibit A documents was never intended to show specific final boundaries and pipeline path lines, because it was merely a

proposed baseline, never intended by any party to reflect the final location. Hence, the court's decision that Appellees' Exhibit A was final and binding, providing a "measuring stick" for the agreed location of the pipeline, was erroneous.

**{¶24}** Appellees respond that these arguments were not made at trial. However, Appellant was unable to raise these challenges at the actual trial in this matter due to the court's initial ruling. Appellees then raise a series of disjointed arguments in the alternative. First, Appellees argue that as the trial court found, Exhibit A states that it is "NOT TO SCALE." It reflects the parties' intent merely to loosely define the boundary lines of the right-of-way, but that great deviation on their part was both possible and allowable. Second, Appellees contend that even if the pipeline is outside of the agreed right-of-way, it does not interfere with Appellant's ability to enjoy his land. Third, Appellees contend they should prevail under the theory of equitable estoppel, as Appellant did not object to the path early enough in the process. Fourth, Appellees raise, in a circular argument, both that Appellant waived his right to damages, and that he cannot succeed in his injunction request because he has an adequate remedy by way of damages.

**{¶25}** It is apparent from this record that this case has a unique and problematic procedural history. Revisiting the procedural history is necessary for a complete review. On August 12, 2020, the trial court determined that the last signed Exhibit A document constitutes the final right-of-way path. The court determined that the last document gave Appellees wide discretion to deviate from that "agreed" path. Thus, the subsequent trial was intended to determine whether the pipeline was installed within the loosely defined confines of the path depicted on Appellees' Exhibit A. In order to review the propriety of the trial court's ultimate decision, we must look at the process used to reach that decision,

beginning with a procedural question: whether the trial court's decision to convert the first bench trial into "oral argument" without the benefit of a full evidentiary hearing was the appropriate mechanism to determine whether Appellees' proposed Exhibit A was unambiguous and, if so, whether that decision should have been revisited after becoming fully aware of the evidence of Mark West's practices regarding route development at the later hearing. Necessarily, we look first to the substantive question of whether the version of Exhibit A on which the court relied demonstrated the parties' final agreed location of the easement. If the answer to this question is in the affirmative, we may then turn to the question of whether any trespass occurred using that easement's path. However, if the answer is no, then the matter must be remanded to determine whether any agreement was reached as to the appropriate path, and on which path the parties finally agreed, if any.

{¶26} Appellees moved to bifurcate the issues of whether Appellees' proposed Exhibit A unambiguously depicted the final easement path and whether the pipe constituted a trespass into two "trials." Specifically, on February 5, 2020, Appellees filed a "Motion to Bifurcate Pursuant to R.C. 2315.21(B)." R.C. 2315.(B)(1) provides that:

> In a tort action that is tried to a jury and in which a plaintiff makes a claim for compensatory damages and a claim for punitive or exemplary damages, upon the motion of any party, the trial of the tort action shall be bifurcated as follows:
>
> (a) The initial stage of the trial shall relate only to the presentation of evidence, and a determination by the jury, with respect to whether the

plaintiff is entitled to recover compensatory damages for the injury or loss to person or property from the defendant. During this stage, no party to the tort action shall present, and the court shall not permit a party to present, evidence that relates solely to the issue of whether the plaintiff is entitled to recover punitive or exemplary damages for the injury or loss to person or property from the defendant.

(b) If the jury determines in the initial stage of the trial that the plaintiff is entitled to recover compensatory damages for the injury or loss to person or property from the defendant, evidence may be presented in the second stage of the trial, and a determination by that jury shall be made, with respect to whether the plaintiff additionally is entitled to recover punitive or exemplary damages for the injury or loss to person or property from the defendant.

**{¶27}** On that same date, Appellees also filed a "Motion to Bifurcate Claims for Declaratory Relief for Initial Bench Trial." In this motion Appellees specifically requested the court to hold an "initial *bench trial* on Count I of [Appellant's] second amended complaint, which seeks declaratory relief." (2/5/20 Motion to Bifurcate.) The motion sought to then have a second trial on the remaining trespass and damage claims. It is readily apparent that two trials, where the parties had the ability to present evidence and testimony, was requested. This request was subsequently granted by the trial court in its February 14, 2020 entry. The parties expected a full trial on both occasions, as

specifically requested within the motions and granted in the judgment entry, which specifically ordered "an initial bench trial," not just "oral argument." (2/14/20 J.E.)

{¶28} Instead of holding a trial on the initial issue, however, this record shows that the trial court unilaterally converted the first trial into "oral argument." We note that no party filed a motion for summary judgment in this case, hence, they apparently understood that there were material questions of fact that the trial court must address. It is unclear whether the parties were informed of the exact nature of the trial court's decision to convert trial to oral argument prior to the hearing, as they were given the opportunity to file briefs, but were apparently not allowed to offer witness testimony.

{¶29} Again, no party sought, and the court did not directly order, that the matter be decided in summary judgment. The court merely ordered oral argument in lieu of a full bench trial on the issue of contract ambiguity. Regardless, the problem with the hearing and the court's decision following this hearing is obvious once we review the evidence that was submitted at the later hearing held on the remainder of the issues. Without procuring testimony from the parties and witnesses and obtaining other possible evidence, it was impossible to determine whether the parties did reach a final agreement on the location of the easement and if they did, what the exact terms of that agreement were. This testimony was presented only during what was supposed be the second trial. Despite the trial court's decision that the parties' contract was unambiguous and Appellees' version of Exhibit A evinced the parties' agreement to final location of the pipelines, it is readily apparent from the testimony adduced at the later hearing from both parties that this was not the case. Both provided evidence that final agreement was not intended to be reached until all parties agreed to the final location, usually just prior to

Case No. 23 JE 0020

construction. All versions of Exhibit A were intended simply to assist them in reaching this agreement. Hence, it should have been apparent to the trial court at least during this trial that the initial decision to the contrary was erroneous.

{¶30} Because of the summary nature of the procedural vehicle employed by the court, its original judgment amounted to an interlocutory order, subject to revisiting during the subsequent trial. However, it is clear from this record that the trial court proceeded as though the parties were to be bound by its initial ruling and it would not be revisited. Because the court ruled in a summary fashion in its initial judgment, this interlocutory summary judgment decision should have been revisited, and a full hearing on the issue of the parties' agreement on the final path of the easement should have been held. It is abundantly apparent that there were a great many issues of material fact on which the parties did not agree regarding the ambiguity raised by the document known as Exhibit A in their contract, and the court's process of summarily deciding without a resolution of these facts was error.

{¶31} Appellant attached a partial transcript of the Gbur deposition to his brief in support of the oral argument ordered by the court. This transcript included Gbur's testimony regarding Mark West's practice in securing a right-of-way easement and the process of selecting the final route. He stated that during the pipeline route development:

> [T]hey're working with the landowner as far as edits, you, know, concerns that the landowner might have. Then, really, it's a lot of back and forth between the landowner, again the different groups within Mark West. . . . Obviously, we have to match up at a property line. So it's a lot of back and forth trying to establish a route. . . .

. . .

If during that process there are some issues that come up, usually it's unknown stuff -- that being said, what I mean is maybe there is some environmental impacts, some stream crossing, some wetlands, some historical archeological type hits that we don't know about that *we'll try to go back to the landowner to adjust, go around some of those features*.

Sometimes construction will come up to us and say "you know, ideally, this isn't a great situation. If we can adjust a route slightly here, can we do this?" If that's the case, again, *we'll go back to the landowner and try to make an adjustment for that*.

(Depo., pp. 11-12.)

**{¶32}** During his deposition, Gbur clarified how the landowner, construction company, environmental, and other groups are to visualize this one-hundred foot wide path in context with almost 130 acres of land. He stated:

During the landowner/land agent negotiations, I mean, we'll show [the landowner] the exhibit. We'll even flag up the route in the field. Sometimes our routers will meet with the land agent and the landowner to walk the route, make changes as needed. *But again, once those agents change the route, it goes back through the vetting process again* with environmental.

(Depo., p. 18.) Gbur was asked if this meant the rerouting plans had to be approved by all parties. He clarified that everyone must sign off on the new route. He also testified that the "flag route" is a process of marking the area of the path on the ground with flags and that this "*is really more for the landowner to look at* and also the other departments of Mark West. If they can go out and take a look at the route, they can see what the corridor, you know, the center line looks like." (Emphasis added.) (Depo., p. 19.)

{¶33} As to a situation where a landowner develops concerns during this process, Gbur testified that:

> So we'll assign a reclamation agent to meet with that landowner to get those concerns. He'll report back. Depending on what those concerns may be, it may involve going back again the different entities, the environmental, the construction, the operational group to get their, either, blessing that we can fix these things. Normally, there is a site visit involved to go out and look at the issues, and we'll do our best to try to resolve these issues."

(Depo., p. 32.)

{¶34} Again, the court ruled on the issue of the easement agreement in a summary fashion, absent a full, evidentiary hearing and without clear notice to the parties that it was conducting a summary judgment analysis. Regardless, the court's initial order, which also lacked final appealable order language, was an interlocutory order subject to revisiting at any time prior to becoming final, certainly during or after the remainder of the issues pending before the court were heard in the bench trial. Despite this, it is apparent

from the dialogue between the parties and the court at the commencement of that trial that the court did not intend to revisit the initial issue; that it was final and the parties were "bound by" Appellees' version of Exhibit A. The initial issue the court was tasked with deciding is whether the parties' agreement, specifically the last signed version of Exhibit A, is unambiguous, and whether it is proof that the parties had a meeting of the minds on the final location of the easement.

{¶35} It also appears that the question of whether the parties intended this version of Exhibit A (or any other version) to represent the final path of the pipeline and thus, the easement, was not definitively answered by the trial court. The court decided that the parties agreed to use only a very rough approximation of where the pipeline would be laid as the final easement path, and that the language on the document would allow for deviation at Appellees' sole discretion.

{¶36} On review, every version of Exhibit A shows it is a very primitive and basic Word document "drawing" of the pipeline path that includes no identifying marking information. The "drawing" actually consists of a square, intended to represent an outline of the entire property, with a line drawn to represent the potential pipeline path. Underneath the small graphic are two lines of type stating: "Parcel lines are shown for reference only and exhibit does not constitute a boundary survey, as defined in Chapter 4733-37 of the Ohio Administrative Code. NOT TO SCALE." (Exhibit B.) This is not surprising, as Mark West would not be expected to expend energy to provide a detailed metes and bounds description to scale, because both parties testified they anticipated that many changes to this path would take place before final agreement was reached. At least seven versions of Exhibit A documents were introduced into evidence in this case.

These show that many changes were made to the path, as each version differs from the other. Precise measurements on any initial versions of Exhibit A would be an unnecessary burden for such tentative placement.

{¶37} The trial court heavily, and perhaps exclusively, relied on the language within Appellees' version of Exhibit A that the drawing did not constitute a boundary survey and was "not to scale" in reaching its decision. However, this language adds nothing to a determination based on the actual facts of this case. A metes and bounds description has no bearing on the ultimate issue, here, which is whether the parties ultimately agreed in any version of Exhibit A to a definitive easement path. While it is clear that the parties agreed to the general, preliminary parameters of an easement, they left open the question of specific location. Gbur testified that when it appeared the parties may have actually reached agreement, the path was marked with flags and the parties walked this path to see if they still agreed. If no other changes seemed necessary, "alignment sheets" were generated and signed, and the construction was started, as it seemed that all parties had finally agreed. Hence, the Exhibit A document relied on by Appellees and the court may represent only an "agreement to agree."

{¶38} Importantly, Exhibit A is only one document of many comprising the parties' original agreement. The actual agreement which created the right-of-way is a recorded document that was signed by parties in October of 2015. The document contains several relevant clauses. First, the document sets out the purpose of the agreement and does provide Appellees with some latitude in determining the pipeline path:

A right-of-way and easement along a route, the location of which shall be determined by GRANTEE (the location of the pipeline, as

constructed, to evidence such route) to locate, excavate, construct, install, operate, maintain, inspect, repair, modify, replace in whole or in part, remove and abandon one or more pipelines for the gathering and transportation of gas."

(10/16/15 Right-of-Way Agreement.)

**{¶39}** While this clause does seem to give Appellees discretion in selecting the route for the pipeline, it also requires that "GRANTOR approves of the location of the proposed easement route across said lands *as mutually agreed to by GRANTOR and GRANTEE.*" (Emphasis added.) (10/16/15 Right-of-Way Agreement.) Thus, while Appellees may initially select the path, the landowner must agree before the easement route is final. Again, the record reveals that at least seven different versions of Exhibit A exist in this case.

**{¶40}** Next, the document addresses restrictions as to the area where the right-of-way will ultimately be created. Notably, two different widths are described: the first is the actual area of the right-of-way. The second allows additional width solely for the purpose of repairing, replacing, or removing existing pipelines after the construction is completed.

The right-of-way and easement herein shall consist of a single strip of land one hundred feet (100') in width during preconstruction, construction and during the time GRANTEE is engaged in any repair, replacement or removal of existing pipelines and appurtenances, and during those times GRANTEE shall also have the right to use an additional width of Property

as reasonably needed along areas of road, railroad, or stream crossing and uneven terrain. At all other times such right-of-way and easement shall be one hundred feet (100') in width.

(10/16/15 Right-of-Way Agreement.)

{¶41} An addendum to the right-of-way agreement provided that "[i]t is also agreed that any relocation of said easement *shall be by mutual consent* and shall not be unreasonably withheld or delayed." (Emphasis added.) (10/16/15 Addendum.)

{¶42} Several months after signing the initial documents, Appellant signed a document granting Appellees access to Appellant's land "for the purpose of performing surveys that include but are not limited to the characterization of land as to property ownership . . ." (Survey Permission, Exh. 12.)

{¶43} Contrary to the court's decision, these documents, when read together, do not provide Appellees with sole discretion in determining the location of the easement. Instead, it is clear that Appellant's agreement as to where the pipeline was laid on his property was also required, although agreement may not be "unreasonably withheld." Allowing Appellees complete discretion would have put nearly all of Appellant's 130 acre cattle farm in play, and Appellant would be left with no control over a large portion of his property. This was not the obvious intent, here. It is clear from the parties' language that they were to work together and mutually agree on a final easement path, that they were attempting to refine in various submissions of Exhibit A.

{¶44} Appellant contends the parties never agreed to a final route. Based on the current record, it is questionable whether they came to a meeting of the minds as to an essential term of the agreement: the final location of the easement. Even if the parties

did reach a valid agreement, it is apparent that, at most, they may have agreed to agree as to final easement location and final location of the easement was left as an open question at the time Appellees began construction of the pipeline.

**{¶45}** In a case arising out of the Eleventh District, two parties entered into a permanent easement to allow for a driveway leading from a state route to a main pump house. *H & S Co., Ltd. v. Aurora*, 2004-Ohio-3507, ¶ 17 (11th Dist.). While the dispute involved a subsequent bona fide purchaser who contested the location of the driveway some fifty years after the agreement, the issue on appeal is similar to the problem at hand: whether an easement that fails to include a metes and bounds description sufficiently describes the easement location.

**{¶46}** The *H & S Co.* court discussed the applicable law as follows:

The failure to describe an easement by metes and bounds does not render the conveying instrument invalid. See *Roebuck v. Columbia Gas Transm*. Corp. (1977), 57 Ohio App.2d 217, 219-220, 386 N.E.2d 1363. The extent and scope of an easement "are to be ascertained from the language of the grant and the circumstances surrounding the transaction." *Amsbary*, 1991 Ohio App. LEXIS 1186, at *8 (citation omitted). The use of extrinsic evidence is proper to determine the extent and scope of an imprecise easement. *Roebuck*, 57 Ohio App.2d at 220, 386 N.E.2d 1363 (citation omitted); *Amsbary*, 1991 Ohio App. LEXIS 1186, at *9 (citation omitted). Thus, when an expressed easement imprecisely describes the location of an easement, the court must examine extrinsic evidence to

determine the location as intended by the parties, which is typically indicated by use. See *Amsbary*, 1991 Ohio App. LEXIS 1186, at *12

*H & S Co.*, at ¶ 16.

**{¶47}** Although the *H & S Co.* court expressed that "more particular terminology could have been utilized to describe the easement," the court relied heavily on the fact that the document creating the easement described a pre-existing road as the location for the easement. *Id.* at ¶ 17. Thus, the document did describe a particular, fixed location, even though it did not contain a metes and bounds description.

**{¶48}** In a case arising out of the Third District, a landowner agreed to provide a right-of-way for purposes of installing a sewer line. *Ayersville Water & Sewer Dist. v. Geiger*, 2012-Ohio-2689, ¶ 7 (3rd Dist.). The agreement included a document referred to as "Exhibit A," which described the easement in more detail. That document provided the easement would be twenty feet wide and "centered on the sewer line," but did not include a metes and bounds description, nor did it provide the pipe's exact placement. *Id.* at ¶ 34. The court found that these facts did not render the agreement entirely ambiguous, but noted that it left open for determination the question of the right-of-way location.

**{¶49}** The court explained that, ordinarily, where there is an undefined easement placement, the owner of the subservient estate is given the initial right to determine the location. *Id.* at ¶ 35. However, evidence in the case regarding the parties' intent tended to show that although the parties testified they each had a different understanding of where the path would be, the main sewer line ran through the road leading from where the district placed the line, not the road where the landowner wanted the line. To place the line where the landowner believed it would go required approval of an extension to a

different sewer system, which would entirely frustrate the purpose of the easement. In addition, building plans were admitted into the record showing the easement along the street where the line was eventually installed. Thus, the court found that easement was properly located.

{¶50} While not directly on point, as both cases involved an attempt to challenge the location of an easement long after construction was complete, they do stand for the proposition that where an agreement fails to establish metes and bounds description of an easement and the question of exact location remains, a court must look to all relevant factors in reaching a final decision.

{¶51} Here, it is clear that the parties reached the following terms: Mark West was entitled to a right-of-way with a width of 100 feet, Mark West agreed to pay Appellant $60 per foot of pipeline laid on the property, and a general parameter of the pipeline path was given, but that exact location would be subject to change for several reasons, including the requirement of landowner agreement.

{¶52} As to Exhibit A, from the documents admitted into evidence and the testimony, particularly from Mark West employees, it is abundantly clear that Exhibit A was never intended, even at the time various versions were signed, to represent final agreement on the ultimate path of the pipeline, and hence, the easement. The intent of both parties was to reach a mutual decision, following an opportunity to walk through the area together and view the topography to determine if either had any concerns moving forward with that proposed location.

{¶53} All of the evidence in the record before us strongly suggests Appellees' Exhibit A was not unambiguously the final easement location. The right-of-way

agreement provides: "GRANTOR approves of the location of the proposed easement route across said lands as mutually agreed to by GRANTOR and GRANTEE." (10/16/15 Right-of-Way Agreement.) We note the use of the phrase "proposed easement." This strongly suggests that the documents called Exhibit A were preliminary in nature. Next, we focus on the phrase "as mutually agreed to." When read together with the clause giving Appellees discretion in deciding location, the phrases show that while Appellees could choose a preliminary location, that path must be mutually agreed upon before becoming final. An addendum to the right-of-way agreement supports this interpretation: "[i]t is also agreed that any relocation of said easement "shall be by mutual consent and shall not be unreasonably withheld or delayed."

{¶54} This process clearly provides landowner participation in every aspect of determining the pipeline path. Gbur specifically testified that the flagging is done for the purpose of ensuring that the landowner can visualize the path. He also conceded that every time a change is made to the path, everyone in the process must review the changes and the flagging process is then reconfigured in accordance with additional changes.

{¶55} Gbur characterized this process as one of "give and take," with constant changes made to accommodate both parties as well as the construction company and environmental representative. Most issues (aside from landowner concerns) involve the presence of streams, rough terrain, and unknown underground obstacles. To put this in perspective, Appellant's property is just shy of 130 acres. Neither party would be expected to know every inch of the terrain, particularly by reviewing the rudimentary Microsoft Word drawing of the property depicted in Exhibit A. Thus, as constant changes

are made and the property is traversed, essentially to double check these changes, the parties work together to develop an appropriate final route.

{¶56} Gbur also seems to take the position that once a landowner disagrees about the location proposed by Mark West, Mark West is no longer required to cooperate and is entitled to unilaterally act based on the last signed version of Exhibit A. Not only is this contrary to the written terms of the agreement itself, it ignores the fact that this pipeline installation benefits Mark West and burdens Appellant. It is Appellees who desire, and in fact need, the proposed easement. It is Appellant whose land and cattle farm will be burdened by the easement he did not seek. According to the usual process detailed by Gbur, Mark West must work with Appellant to ensure he has no objections to the final location of the easement. And again, the record includes at least seven versions of Exhibit A. It appears unreasonable to hold Appellant to any of these at any point in the process just because they were all signed. If Mark West believed Appellant was being unreasonable in refusing to sign off on a later proposal, it appears there may be redress under the contract. There is no provision for unilaterally beginning construction, however.

{¶57} While Gbur testified that where a landowner fails to sign a version of Exhibit A following a change by Mark West, the most recent signed Exhibit A becomes the final pathway, this is not apparent in the language of the contract and ignores the very process that Mark West utilizes. In order to arrive at a mutually agreed location, there is a standard process of allowing both parties to jointly arrive at a final location by amending the proposed path, and to allow both parties to voice objections to the proposed path and alter it based on those objections until the parties ultimately agree on final location.

**{¶58}** Gbur specifically stated "[b]y signing that survey permission, it also allows us to get our contractors in the field to, basically, walk that route to see if there's any issues constructability-wise, and to meet with the landowners as well to see if they have any issues." (Trial Tr., p. 44.) Then, "[w]e'll get environmental out there to look for environmental features, like streams and wetlands, cultural resource hits, and then that process really kind of – *it's a lot of back-and-forth between all these groups and the landowner, getting that route.*" (Emphasis added.) (Trial Tr., p. 44.)

**{¶59}** The very fact that Mark West presented a new version of Exhibit A to Appellant shows that the route was still in development when Appellant refused to agree to the new proposal. To simply cease efforts and begin construction appears violative of the cooperative nature of the agreement. This was not a contract where Appellant agreed that Appellees had final say over laying their pipeline across a vast swath of his cattle farm. The record reflects the parties were required to work together and develop a mutually agreed upon path for the pipelines and easement.

**{¶60}** While it is certainly true that parties can agree to uncertain terms with the understanding that flexibility is appropriate and may be exercised, the record in this case suggests that Appellant intended to reserve final right to approve where the pipeline was ultimately to be constructed and Mark West agreed, unless approval by Appellant was "unreasonably" withheld.

**{¶61}** Turning to Appellees' arguments, as to whether Appellant objected at the proper time, the evidence shows he objected several times. The pipelines had not yet been buried at the time certain employees of Mark West were made aware of Appellant's

objection to their placement. Gbur testified that the only other time this happened, the pipeline was moved to accommodate the landowner.

**{¶62}** Appellees claim that Appellant has not demonstrated a limitation on his use and enjoyment of the property. This is clearly contradicted by the record. Appellant was specifically asked if the pipeline interfered with his use and enjoyment of his property and he responded in the affirmative, and offered testimony as to specific problems. Further, the pipe is buried only three feet underground. Thus, Appellant is limited in his ability to dig or plant crops in these areas without potentially striking a pipeline carrying natural gas. Finally, the pipeline may need to be serviced or replaced in the future, which may require disruption of the area again.

**{¶63}** As to Appellees' argument the trial court correctly determined that if they have intruded into land outside of the easement, any intrusion is slight and no recovery is warranted, as we must remand this matter for the trial court to determine whether an agreement was ever reached and, if so, where they agreed the easement was located, this matter is not ripe for our consideration. However, we note that any intrusion outside an easement constitutes a trespass, no matter how slight that intrusion may be. Ohio law provides that "even if the injury was slight, the trespass could still give rise to at least a claim for nominal damages." *Smith v. A.B. Bonded Locksmith, Inc.*, 143 Ohio App.3d 321, 326 (1st Dist. 2001). Thus, the level of intrusion is of no relevance, and the question is limited to whether there was an intrusion into a place that Appellees were not entitled to occupy.

**{¶64}** Finally, Appellees make a circular argument that Appellants are not entitled to damages or an injunction. Both of these statements cannot be true. Appellant cannot

Case No. 23 JE 0020

be barred from seeking an injunction on the basis that damages are available, while also arguing that damages are unavailable. Again, however, as we are reversing the trial court's decision and remanding this matter, it is, likewise, not ripe for review.

{¶65} Based on the above, the trial court erred by determining that Appellees' version of Exhibit A is not ambiguous and clearly provides the final location of the easement, and this decision is reversed. At worst, the record reflects that the parties merely entered into an "agreement to agree." At best, the terms of the parties' agreement are ambiguous. The matter is remanded to determine whether the parties had a meeting of the minds as to all essential terms of the contract and to hold a new trial to resolve the issues raised in the complaint in this regard.

<u>ASSIGNMENT OF ERROR NO. 2</u>

The trial court then erred when it determined that a portion of the pipeline built on Appellant's property east of the "Zelek Corner" is within the "approved" right of way, even though no such right of way is depicted on that portion of Appellant's lands in Exhibit A.

{¶66} Appellant focuses his argument on a specific area of his property which is referred to as the "Zelek corner," located near a corner which abuts the Zelek property.

{¶67} Due to our resolution of Appellant's first assignment of error, Appellant's second assignment of error is moot.

ASSIGNMENT OF ERROR NO. 3

The trial court erred when it concluded that Appellees' promise to erect working electrical fences across Appellant's property was "merely gratuitous."

{¶68} Appellant correctly asserts the trial court found that he had proven all elements of an oral contract at trial, but determined that the promise to install an electric fence was merely gratuitous. Appellant contends that this fencing was necessary to his cattle farm operation. It was to allow his cattle to graze without being injured by the construction process. Because the fence was not completed, and did not work in the areas where it was installed, Appellant was forced to confine his cattle to barns for several months. His damages included the costs of purchasing hay and providing feed, which would be unnecessary if they were able to graze as usual, the labor required to feed and water the cattle in the barns, as well as the increased labor of cleaning the barns. Had the fencing been completed and operable, none of these expenses would have been incurred.

{¶69} "To prove the existence of a contract, a plaintiff must show that both parties consented to the terms of the contract, that there was a 'meeting of the minds' of both parties, and that the terms of the contract are definite and certain." *Ramun v. Ramun*, 2014-Ohio-4440, ¶ 27 (7th Dist.), citing *McSweeney v. Jackson*, 117 Ohio App.3d 623, 631 (4th Dist. 1996).

{¶70} "Ohio courts have held that "[t]he burden of proof on one seeking to enforce an oral contract requires that party to prove the existence of the contract by clear and

convincing evidence. 'Clear and convincing evidence' is evidence that will produce in the fact-finder's mind a firm belief or conviction as to the facts sought to be established." (Citations omitted.) *Id.,* citing *Bumgarner v. Bumgarner*, 2010-Ohio-1894, ¶ 20 (4th Dist.).

> Gratuitous promises are not enforceable as contracts, because there is no consideration. * * * A written gratuitous promise, even if it evidences an intent by the promisor to be bound, is not a contract. * * * Likewise, conditional gratuitous promises, which require the promisee to do something before the promised act or omission will take place, are not enforceable as contracts. * * * While it is true, therefore, that courts generally do not inquire into the adequacy of consideration once it is found to exist, it must be determined in a contract case whether any 'consideration' was really bargained for. If it was not bargained for, it could not support a contract.

*Williams v. Ormsby*, 2012-Ohio-690, ¶ 17, citing *Carlisle v. T & R Excavating, Inc.,* 123 Ohio App.3d 277, 283-284 (9th Dist.1997).

{¶71} The consideration for the oral contract, here, is clearly provided on the record. Appellant operates a cattle ranch. His desire to protect his cattle and his cattle operation during the pipeline construction is apparent. Hence, any agreement to allow an easement was conditioned on Appellees' agreement to build an electric fence, which would allow Appellant's cattle to freely graze but keep them away from the area of construction. The fact that Mark West did, in fact, attempt to build this fence demonstrates

their acceptance. Appellant's agreement to allow Appellees' encroachment into an area where cattle operations take place was consideration for the oral contract.

{¶72} It is significant, here, that Appellees undertook partial performance. Appellees contend that while no agreement was ever reached, they gratuitously installed a significant amount of fencing although they never completed the project. They conceded at trial that they exerted considerable effort on several occasions to repair problems with the fencing. Appellees acted in a fashion that supports Appellant's contention the parties had reached a meeting of the minds. As such, this record reveals the parties entered into an oral agreement where Appellees agreed, in addition to paying monetary compensation for laying pipeline, to provide electric fencing in exchange for Appellant allowing an easement to build the pipeline through Appellant's cattle operations.

{¶73} Additionally, as Appellant point out, the easement agreement provides:

> GRANTEE agrees to indemnify, protect, save harmless and defend GRANTOR from and against any loss, claim or expense, including without limitation, claims for injury or death to persons or damage to property, occurring as a result of the right of GRANTEE'S use of GRANTOR's land pursuant to this Right-of-Way Agreement, or as a result of loss, expense, injury or death which would not have occurred but for the GRANTEE'S use of GRANTOR'S land pursuant to this Right of Way Agreement.

(10/16/15 Right of Way Agreement.). This language additionally supports Appellant's request for damages.

**{¶74}** Appellees also question the amount of damages sought. However, at trial, Appellant introduced and supported the figure of $76,000, and Appellees did not contest that amount in any way. Hence, Appellees cannot now attack the amount of damages, as they have waived this issue.

**{¶75}** Appellant provided evidence that he incurred expenses amounting to $76,000 as a result of being forced to keep his cattle in barns due to the pipeline construction. Appellees failed to build an electric fence, as agreed. Appellees also separately agreed to make Appellant whole if any expenses were incurred as a result of the construction. As such, Appellant's third assignment of error has merit and is sustained.

Conclusion

**{¶76}** Appellant argues the court erred in holding that the parties specifically agreed to the final path of a right-of-way granted for purposes of installing a pipeline when they signed a version of a document called Exhibit A. However, it appears from this record that Exhibit A was intended to reflect a preliminary, working document which constantly changed, and was never meant to reflect a final depiction of the pipeline path. The trial court's decision to dispose of the issue in a summary fashion when there are clearly outstanding and material factual disputes was error. The trial court's decision is reversed, and we remand for a full hearing on whether the parties reached final agreement as to the path of an easement. The court must determine whether the parties reached a final agreement as to location of the easement and, if so, where said easement is located and whether trespass occurred. The trial court's decision that the parties had entered into a valid oral agreement to build a protective electric fence on Appellant's cattle

farm, but that this agreement was gratuitous, is also reversed. Consideration for the agreement is apparent on the record, and damages were proven. The trial court is to enter judgment for Appellant for this issue in the amount of $76,000. All other assignments are moot. For the reasons provided, Appellant's arguments have merit and the matter is reversed and remanded for further proceedings.

Robb, P.J. concurs.

Hanni, J. concurs.

[Cite as *Cameron v. Mark W. Liberty Midstream & Resources, L.L.C.*, 2024-Ohio-5279.]

---

For the reasons stated in the Opinion rendered herein, Appellant's first and third assignments of error are sustained and the second assignment is moot. It is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Jefferson County, Ohio, is reversed. This cause is remanded to the trial court for further proceedings according to law and consistent with this Court's Opinion. Costs to be taxed against the Appellees.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## <u>NOTICE TO COUNSEL</u>

**This document constitutes a final judgment entry.**